THE SMOOT SAND & GRAVEL CORPO-
RATION, Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 7886.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 19, 1959.

Decided Jan. 11, 1960.

David R. Shelton, Washington, D. C., for petition.

David O. Walter, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen.; Lee A. Jackson and A. F. Prescott, Attys., Dept. of Justice, Washington, D. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

SOBELOFF, Chief Judge.

This case, here for the second time, concerns the taxpayer's liability for the years 1945–1950 for surtaxes under § 102 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 102 [1] by reason of the alleged accumulation of profits "for the purpose of preventing the imposition of the surtax" upon its sole shareholder, Columbia Sand & Gravel Company, Inc., and upon L. E. Smoot, owner of all the common stock of Columbia. The Tax Court having sustained the Commissioner's position in the first trial of the case, this court, on review, concluded its opinion as follows:

"Accordingly, we affirm the Tax Court on all issues except as to the working capital (exclusive of self-insurance reserves) necessary in petitioner's business and as to the ready-mix business, and remand the case to the Tax Court for findings in those respects in accordance with the views expressed in this opinion." Smoot Sand & Gravel Corp. v Commissioner, 4 Cir., 1957, 241 F.2d 197, 208, certiorari denied 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437, rehearing denied 354 U.S. 943, 77 S.Ct. 1401, 1 L.Ed.2d 1541.

After remand, the Tax Court took further evidence and again upheld the Commissioner's imposition of surtaxes under § 102.

1. Section 102 provides, in relevant part, as follows:

"§ 102. Surtax on corporations improperly accumulating surplus.

"(a) [as amended by Sec. 103(d), Revenue Act of 1941, c. 412, 55 Stat. 687] *Imposition of tax.* There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following:

"27½ per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus

"38½ per centum of the undistributed section 102 net income in excess of $100,000.

\*      \*      \*      \*      \*

"(c) *Evidence determinative of purpose.*—The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary \* \* \*."

The background of this controversy is fully set forth in the two memoranda of the Tax Court, T.C. Memo 1956–82 and T.C. Memo 1958–221, respectively, and in our earlier opinion at 241 F.2d 197. It would serve no useful purpose to repeat all the facts that have been developed in the course of the litigation, but as we proceed we shall outline the evidence relevant to the disposition of the present issues.

Three main questions are involved on this review:

I. Did taxpayer's officers *reasonably believe* that it was necessary to accumulate earnings and profits, since the taxpayer might have to enter the ready-mix concrete business?

II. How much working capital was needed by the taxpayer?

III. Upon whom is the burden of proof as to the asserted unreasonable accumulation of earnings and profits?

### I

Did the taxpayer *reasonably believe* in the years 1945–1950 that it would likely be forced into the ready-mix concrete business, thus justifying an accumulation of earnings and profits for that purpose? The Tax Court has now found that the taxpayer never intended to enter the business; never formulated any definite plans for doing so; was not at any time during the years in question under any real threat from its customers or its competitors which might reasonably have been regarded by petitioner's officers as likely to force taxpayer into the ready-mix business; that "if any such threat ever existed it did not extend beyond 1940 at the latest." In sum, the finding is that "petitioner's officers had no reasonable cause to consider petitioner's entry into the ready-mix business as more than a remote possibility, or to accumulate petitioner's earnings and profits for that purpose."

It is the taxpayer's initial contention that the Tax Court found in its favor on this issue at the first trial and changed this finding in the second although no further unfavorable evidence was adduced. Great emphasis is placed by the taxpayer on the following passage of the Tax Court's first memorandum opinion:

"In the meantime, the ready-mix concerns began demanding certain price concessions and other concessions which petitioner was unable or unwilling to grant, and transferring as much of their business as possible to petitioner's competitors. By 1945 this situation had reached the point where, *in the opinion of petitioner's officers,* it constituted a severe threat to petitioner's business. Petitioner was confronted with the alternative of going into the ready-mix business itself or losing the major portion of its sand and gravel market." (Emphasis supplied.)

We believe, however, that the Tax Court explains this statement adequately in its second opinion, when it declares,

"In our original findings of fact we found that in the opinion of petitioner's officers, the actions of the ready-mix concerns in the vicinity of petitioner's business posed a serious threat to the continuation of the business as operated by petitioner, and that petitioner might eventually be forced into the ready-mix business itself. This finding was based on the testimony of petitioner's officers as to their state of mind during the critical period, some 6 to 10 years previously. We did not find that any such threat to petitioner's business constituted a reasonable need for a cash reserve sufficient to equip the petitioner for entry into the ready-mix business on a competitive basis, or what would have been a reasonable amount for such a reserve."

Taxpayer's main contention on this issue appears to be that its officers sincerely believed that it would be forced into the ready-mix industry because "[f]rom 1940 on petitioner was under heavy attack from powerful financial forces seek-

ing to destroy and take its business." Taxpayer's brief continues as follows:

"Also, on the basis of its long and repeated experiences, petitioner knows that those seeking to take or detroy its business will stop at nothing and will resort to such tactics as attempts to have Mr. Smoot indicted under the anti-trust laws, attempts to have petitioner's business destroyed under the anti-trust laws, attempts to have petitioner's business destroyed under the penalty surtax provisions of the Internal Revenue Code, attempts to have its customers' bank credit cut off if they continue to be petitioner's customers, and so on."

Eloquent but unsupported assertions in the brief do not take the place of testimony or proof. The "powerful financial forces" (also referred to, in taxpayer's brief, as "powerful invading financial interests from outside of Washington") are not identified by petitioner, nor is there evidence in the record of any threats made or pressures brought to bear against petitioner in the 1945–1950 period. The taxpayer's unsubstantiated allegations do not require or even permit a finding that it entertained at the time a reasonable belief that it would have to enter the ready-mix business.

In further support of its asserted "reasonable belief," taxpayer presses several other considerations. It declares that at the end of World War II it was in a seriously weakened condition since its inventory and productive facilities were exhausted to such a point that it could not satisfy all the orders of its customers. Taxpayer maintains that "[d]ue to its weakened condition petitioner's management felt strongly that it was in greater peril than ever before from the ready-mix concrete industry during the 1945–1950 period." The proposed inference of weakness does not necessarily follow, and there is nothing more than bare assertion to support it. That the Tax Court interpreted petitioner's situation in a different light is evident from its finding that " * * * petitioner was in a strong

economic position with more demands on its production than it could meet * * * ". We think that the Tax Court was certainly not without warrant in its conclusion that taxpayer's inability to supply the demands on its production is, in the circumstances of this case, evidence of a strong, not a weak, economic position. Strong or weak, it sheds no light on the issue of whether the corporation, willingly or unwillingly, anticipated going into the ready-mix business.

Next, petitioner insists that "[b]y 1945 substantially every major sand and gravel producer had been forced into the ready-mixed concrete business or destroyed and absorbed by that industry." (Emphasis supplied.) However, one of taxpayer's own witnesses, Vincent P. Ahearn, Executive Secretary of the National Sand and Gravel Association and the National Ready-Mixed Concrete Association, in explaining why the sand and gravel companies themselves have developed ready-mix concrete businesses, testified:

"It is a logical development because the sand and gravel producer produces two of the ingredients—of the industry, the fine and the coarse aggregate. Furthermore, he has the necessary facilities—the yards, the hoists, and the draglines. In many cases he has the staff to help develop the business. He had to expand his industry and his equipment, but it was more logical for him to do it in nearly every case than it was for a newcomer to come into the field. * * * "

There is not a word here about sand and gravel producers being forced into the ready-mix business or else being destroyed and absorbed. It is undisputed that the corporation did not, voluntarily or involuntarily, enter this business at any time. The Tax Court did not exceed reasonable limits in concluding from all the testimony in the case that there was at the time no reasonable cause to consider petitioner's entry into this new enterprise more than a remote possibility.

Another circumstance cited by petitioner is that it "kept from $3,000,000 to $3,300,000 on deposit in the Riggs National Bank, without interest, in the hope that those seeking to destroy or take its business would be deterred." This is treated as strong proof of its contention; yet petitioner does not really tie in the deposit with the alleged reasonable belief that it would be forced to engage in the ready-mix business. The fact that it kept on hand a large balance of uninvested cash is entirely neutral in respect to the issue the Tax Court was called upon to decide. There may have been other reasons for maintaining this accumulation, such as the expectation of deflation felt by many at the close of the war. In our earlier opinion, we noted that petitioner claimed to be "awaiting 'the usual post-war deflation.'" 4 Cir., 1957, 241 F.2d 197, 202.[2]

Finally, taxpayer points to the Tax Court's decision in Breitfeller Sales, Inc., 1957, 28 T.C. 1164, as contrary to its holding here. On the facts of that case the taxpayer, an automobile dealer, was held justified in accumulating earnings because of the "possibility that it might be required to finance a new dealership * * *" It should be observed that a "contemplated" expansion must be shown to have been a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations of surplus. Helvering v. National Grocery Co., 1938, 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346; Hedberg-Friedheim Contracting Co. v. Commissioner, 8 Cir., 1958, 251 F.2d 839. The finding in Breitfeller was that the taxpayer's directors, during the years in issue, "reviewed and approved plans and policies for expanding facilities, making provision for protection of petitioner's 'interest' in the St. Albans area, and the possible financing of installment sales of automobiles." 28 T.C. 1164, 1167. In the case at bar, however, there was no such

evidence and no such finding; on the contrary, what the Tax Court did find was that the petitioner never intended to enter the ready-mix business and never formulated definite plans for doing so.

## II

How much working capital was needed by the taxpayer in the years from 1945 to 1950? In our earlier opinion, we said that:

"Working capital needs of businesses vary, being dependent upon the nature of the business, its credit policies, the amount of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors.

"In our view, the Tax Court should make a determination of petitioner's working capital needs based upon the foregoing considerations. * * *" 4 Cir., 1957, 241 F.2d 197, 207.

The Tax Court has now found that most of petitioner's sales during the years in question were for cash, payable within 30 to 60 days; that the average inventory turnover period was less than 4 days; that the average closing inventory of sand and gravel, at the end of each year, that is "Finished Goods," was not over $5,000.00; that the "Raw Materials" inventory was even less; that credit was readily available to petitioner; that the nature of the operations was such as to require a working capital reserve "for very much less than a full year"; and that, in conclusion, considering the above factors, as well as petitioner's direct and indirect expenses and cost of goods sold, "petitioner's working capital requirements would not have been in excess of between about $200,000 and $350,000 at any given time for the years under consideration." Petitioner's need for working capital for each of the tax-

---

**2.** It is also noteworthy that while the taxpayer claims to have retained over $3,000,000 in cash to impress competitors with its ability to enter the ready-mix business, its balance sheets during the years in question show a reserve of only $500,000 for the purchase of concrete mixing equipment. See note 4 infra.

able years was estimated by the court as follows:

| Year | Reasonable Working Capital |
|------|---------------------------|
| 1945 | $201,997.45 |
| 1946 | 191,693.94 |
| 1947 | 197,557.52 |
| 1948 | 248,191.08 |
| 1949 | 351,667.37 |
| 1950 | 333,826.67 |

The Tax Court then turned to a broader consideration of the petitioner's financial situation in the relevant years. After an analysis of stipulated balance sheets taken from income tax returns, and in light of the other evidence, the court concluded that the Commissioner's imposition of surtaxes for unreasonable accumulations of surplus was proper. Its computation follows:

|  | 12/31/45 | 12/31/46 | 12/31/47 |
|--|---------|---------|---------|
| Reserves per books | $4,298,728.25 | $4,347,084.39 | $4,464,566.42 |
| Surplus not "Earmarked" | 2,088,596.99 | 2,276,848.46 | 2,543,351.52 |
| Total surplus | $6,387,325.24 | $6,623,932.85 | $7,007,917.94 |
| Less: |  |  |  |
| Reserves accepted as reasonable | $4,298,728.25 | $4,347,084.39 | $4,464,566.42 |
| Loans to customers | 72,917.00 | ——— | 135,000.00 |
| Working capital | 500,000.00 | 500,000.00 | 500,000.00 |
| Unreasonable accumulation | $1,515,679.99 | $1,776,848.46 | $1,908,351.52 |

|  | 12/31/48 | 12/31/49 | 12/31/50 |
|--|---------|---------|---------|
| Reserves per books | $4,623,732.11 | $4,566,666.38 | $4,738,103.32 |
| Surplus not "Earmarked" | 2,618,292.96 | 2,697,915.75 | 2,908,702.60 |
| Total surplus | $7,242,025.07 | $7,264,582.13 | $7,646,805.92 |
| Less: |  |  |  |
| Reserves accepted as reasonable | $4,623,732.11 | $4,566,666.38 | $4,738,103.32 |
| Loans to customers | 150,000.00 | ——— | 92,505.00 |
| Working capital | 500,000.00 | 500,000.00 | 500,000.00 |
| Unreasonable accumulation | $1,968,292.96 | $2,197,915.75 | $2,316,197.60 |

After this preliminary examination of the Tax Court's findings we look more closely at the applicable statutory provisions. Section 102(a) provides that a surtax shall be imposed on corporations which are formed or availed of for the purpose of avoiding the surtax on its shareholders by permitting earnings and profits to accumulate instead of being distributed to the shareholders. Section 102(c) provides that the fact that earnings and profits are permitted to accumulate beyond the *reasonable needs* of the business is *determinative* of the purpose to avoid surtax upon shareholders unless the corporation proves the contrary by the clear preponderance of the evidence. Thus, the size of the accumulated earnings and profits or surplus is not the crucial factor; rather, it is the reasonableness and nature of the surplus. Part of the surplus may be justifiably earmarked

in the form of reserves, for specific, necessary business needs.[3]  Again, to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity.  Lasser and Holzman, Corporate Accumulations and Section 102, 93 (1949) and cases cited therein.  Where, on the other hand, the accumulation of surplus is reflected in liquid assets in excess of the immediate or reasonably foreseeable business needs of the corporation, there is a strong indication that the purpose of the accumulation is to prevent the imposition of income taxes upon dividends which would have been distributed to the shareholders.  Hall, "The Taxation of Corporate Surplus Accumulations," Joint Committee on the Economic Report, 82nd Cong., 2nd sess., quoted in Bittker, Federal Income, Estate, and Gift Taxation (2nd ed., 1948), 487;  see also Mertens, Law of Federal Income Taxation, § 39.51 (1956) and cases cited therein.

■■ The ultimate question whether a corporation is availed of for the purpose of avoiding surtax on shareholders is one of fact.  Unless the finding of the Tax Court is clearly erroneous, it should not be disturbed by the Court of Appeals.  26 U.S.C.A. § 7482(a);  Casey v. Commissioner, 2 Cir., 1959, 267 F.2d 26;  Pelton Steel Casting Co. v. Commissioner, 7 Cir., 1958, 251 F.2d 278.  In order to determine whether the Tax Court's conclusions are clearly erroneous, we shall review the petitioner's financial condition for these years.  In so doing, we shall address ourselves directly to the petitioner's contention that the Tax Court made the "astonishing mistake" of failing to grant allowances for the amounts specifically found by the Tax Court in its first opinion as properly allowable as reserves for (1) bad debts, (2) depreciation, (3) depletion, and (4) tax liabilities, allegedly ranging from $2,898,337.12 to $4,276,070.98 during the 1945–1950 period.

Appended are the balance sheets for each of the tax years in question, and we examine the figures for 1945 as fairly illustrative.[4]  It will be seen that the reserves earmarked out of surplus total $4,298,728.25;  the surplus not earmarked is $2,088,596.99;  the total surplus is thus $6,387,325.24.  Of this sum, the Tax Court accepted as reasonable all the reserves earmarked on the balance sheet.[5]  Taxpayer now asserts that the reserves accepted by the Tax Court are insufficient and that additional allowances should have been made to cover *bad debts, depreciation and depletion.*

A reserve for *bad debts* or allowance for doubtful accounts represents an estimate of the amount of the accounts and notes receivable which will be uncollectible.  The purpose of the reserve is (1) to charge the loss against the period in which it was actually incurred as a result of the sale of goods to customers whose accounts subsequently prove to be uncollectible and (2) to show the estimated realizable value of the customers' accounts.  Finney & Miller, Principles of Accounting—Intermediate, 207 (5th ed., 1958).  A taxpayer using the reserve method is allowed, under the Internal Revenue Code,[6] to charge off this estimated amount as an expense of its current operations.  The appropriate accounting entry is to debit or charge an account called "bad debt expense" and to credit an account called "reserve for bad debts."  The amount charged to bad debt

3. In this connection, we think it appropriate to reiterate what was said in our earlier opinion in this case:
   "It is not necessary for a corporation to create surplus reserves on its books to cover its future business needs, as the petitioner here did.  The Statute imposes no such evidentiary requirement, nor is the mere book entry conclusive, in a Section 102 case, that the reserve is for a reasonably anticipated business need."
   4 Cir., 1957, 241 F.2d 197, 207.

4. See Appendix.

5. See note 3 supra.

6. Internal Revenue Code of 1939, Section 23(k) (1), 26 U.S.C.A. § 23(k) (1);  Internal Revenue Code of 1954, Section 166 (c), 26 U.S.C.A. § 166(c).

expense is deducted by the taxpayer in computing his annual profit or loss. Therefore, this reduces net income for the year and likewise reduces the surplus account of the business. On the balance sheet, accounts receivable and notes receivable are shown *net* of the reserve for bad debts, and only the net figure is deemed to show the value of the receivables. The taxpayer is thus totally incorrect when it claims additional reserves for bad debts, because the bad debt expense has already been eliminated from surplus; moreover, only the *net* receivables were considered by the court in evaluating the taxpayer's assets which are available for dividends.

For the same reasons, the taxpayer's argument concerning the reserves for *depreciation and depletion* cannot be accepted. Surplus has already been reduced by annual charges to depreciation expense and to depletion expense; allowing them again would give the taxpayer double deductions. We are cognizant of the fact that replacement of taxpayer's wasting assets will ultimately become necessary, and that for this purpose cash or other liquid assets must be available; but, as will appear, taxpayer had much more liquidity than necessary for such replacement and for all other reasonable business needs.

Likewise, petitioner complains that it was denied a reserve for additional *income tax liabilities* asserted by the Commissioner in the following *alleged* amounts:

| | |
|---|---|
| 1945 | $ 723,166.73 |
| 1946 | 1,155,907.50 |
| 1947 | 1,717,317.99 |
| 1948 | 1,794,562.00 |
| 1949 | 434,803.71 |
| 1950 | 516,275.17 |

It is undisputed that in 1946 a notice of deficiency was sent to taxpayer asserting deficiencies in income and excess profit taxes for the years 1940 to 1944 in the total amount of $922,619.84. At the same time, deficiencies were asserted against Columbia Sand & Gravel Company, Inc., and L. E. Smoot, individually. The claims against all three were settled in 1949. The taxpayer's deficiencies were determined to be $301,512.06 and were paid in 1949 and 1950.

The amounts of the deficiencies which the taxpayer alleges were asserted against it are nowhere proved, except as to the $922,619.84. It should be observed that on the petitioner's balance sheets, a reserve for federal income tax appears for each of the years in question, but in much smaller amounts than are now alleged. Petitioner declares that its income tax liability, in the amounts stated above, was specifically found by the Tax Court in its first opinion. This is a bold claim in light of what the Tax Court actually said:

"The additional tax liabilities determined against the petitioner for the years 1940 to 1944, inclusive, which were outstanding at the close of the years 1945 to 1950, inclusive rose from less than $1,000,000 in 1945 to a peak in 1948 of $1,794,562, including interest. We recognize, of course that petitioner was entitled to maintain a cash reserve sufficient to pay any tax liabilities which had been determined against it, except perhaps section 102 tax. At the same time, however, it is perfectly obvious that petitioner at all times during the 1945–1950 period had sufficient ready capital on hand over and above all asserted needs.

"A word may perhaps be appropriate as to the size of the tax liabilities claimed by petitioner to have existed in the taxable years. *Petitioner adds to its own deficiencies those determined against Columbia, its sole stockholder, and Smoot, Columbia's sole stockholder.* But while petitioner may have been entitled to

retain funds for the payment of its own indebtedness, we think it clear that no supposed liabilities involving its immediate and remote stockholders, could be characterized as a need of its business. A distribution of its profits would have put those stockholders in funds so that they in turn could meet whatever tax liabilities might ultimately be imposed." (Emphasis supplied.)

Even if we assume that the taxpayer was entitled to an allowance of some part of the amount it claims, in excess of the allowances made, as a reserve for tax liability, the failure to grant this would not change the result in this case, since all *proper* allowances would still be insufficient to account for the accumulations of surplus.

In its analysis of petitioner's financial condition the Tax Court accepted as reasonable all the reserves listed on the balance sheets, stating that "although in some cases the items included are doubtful as to character or amount, the benefit of that doubt has been extended in petitioner's favor." The court added that:

" * * * as to a number of items on which the amount of the reserve was virtually the only evidence of a reasonable figure for the business needs, we may have fallen into error in viewing them as a proper measure of reasonable accumulations. Such items are, for example, $500,000 for ready-mix as originally allowed although it now appears that this allowance is overgenerous, reserves for Federal income taxes and contract bonds. Since, however, we regard these issues as no longer open upon the remand, we have retained the original figures in our summary."

■ We can understand the court's impression that the issue as to several of the reserves was no longer open upon

the remand. However, we agree that the court was, to use its own word, "overgenerous" in the second proceeding, since it allowed (1) $500,000 for the purchase of concrete mixing equipment, in spite of its specific finding that the taxpayer did not need to accumulate any amounts whatever for this purpose, (2) $500,000 for working capital, although the court found taxpayer's needs to be less than this, (3) $250,000 for contract bonds, although this court held, in its earlier opinion, that no justification appears for this reserve.[7] Furthermore, it should be noted that in our earlier opinion, we concluded that in the existing circumstances, "it is difficult to perceive any justification for creating a reserve for bond indebtedness,"—i. e., accrued interest on the corporation's bonds held by Mr. Smoot individually. 4 Cir., 1957, 241 F.2d 197, 204. Finally, we have considerable doubt about the allowance of the large reserve in the sum of $1,333,000 for post war rehabilitation, which apparently merely involves future replacement of depreciated and depleted assets. We have previously noted that depreciation and depletion charges are deducted from surplus during the useful life of assets. Replacement of assets which are fully depreciated or depleted requires available cash but does not require a second appropriation of surplus. It is only when rehabilitation plans involve replacement of old equipment with equipment costing more than the original, or when additional equipment is required, that appropriation of surplus is justified. As stated in our earlier opinion, the taxpayer was not expecting inflation but deflation. None of the possible justifications for additional replacement reserves has been shown. On balance, it is clear enough that, however viewed, the allowances made by the Tax Court exceed any amount the taxpayer could possibly justify as reasonable reserves.

Having examined the reserves needed by the business, we turn to the amount of liquid assets available to meet these

7. 4 Cir., 1957, 241 F.2d 197, 203–204.

needs. In 1945, taxpayer had the following liquid assets:

| | |
|---|---|
| Cash | $2,950,115.64 |
| Net notes and accounts receivable | 94,063.36 |
| Inventories | 47,619.01 |
| Investments: | |
| Obligations for U. S., State, etc. | 1,324,531.72 |
| Other securities | 7,922.34 |
| Net loans secured and unsecured | 1,091,628.89 |
| | $5,515,880.96 |

Its only current liability was Accounts Payable, $1,092.59. Thus, petitioner had liquid assets of more than $5,500,000, much in excess of what was reasonably required in the business (even after taking into consideration amounts necessary to replace depreciated and depleted property).

Analysis of the other years in issue discloses a similar picture and leads to the same conclusion of unreasonable accumulations.

Viewed in broader context, the corporation's record of earnings and dividends over the years is also quite revealing. In every year since 1927 taxpayer has had net earnings in amounts ranging from approximately $200,000 to over $1,-000,000. Twice only in this period has it declared dividends, $20,000 in 1928 and $800,000 in 1932. In the latter year, when L. E. Smoot reported the dividends of $800,000 in his individual income tax return, he had offsetting loss deductions of over $600,000. No other dividends have ever been paid, and the company's surplus has been permitted to swell.

The Tax Court's conclusion, far from being clearly erroneous, seems to be clearly correct.

### III

On the question of burden of proof the Tax Court decided that, in the circumstances of this case, the burden of proof rests with the taxpayer, notwithstanding Sec. 534 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 534.[8] We need not decide the point here since, even assuming that the burden of proof was on the Government, we are convinced, as was the Tax Court, that this burden has been met by affirmative proof of "a deliberate, consistent and inescapable intention to retain its net earnings for the purpose of avoiding the surtax upon its immediate and ultimate stockholders."

The decisions of the Tax Court are Affirmed.

8. Section 534 of the 1954 Code provides that the burden of proof shall be shifted to the Government if, after receiving notification from the Secretary or his delegate of an intention to assert a deficiency on the basis of unreasonable accumulation of earnings, the taxpayer submits a statement of the grounds (together with facts sufficient to show the basis thereof) on which it relies to escape the tax on all or any part of the earnings and profits by establishing the accumulations have been reasonable.

# APPENDIX

## The Smoot Sand & Gravel Corporation (Delaware)

### Balance Sheets Taken from Income Tax Returns
### 1945 through 1950

| | Dec. 31, 1945 | Dec. 31, 1946 | Dec. 31, 1947 | Dec. 31, 1948 | Dec. 31, 1949 | Dec. 31, 1950 |
|---|---|---|---|---|---|---|
| Cash | $2,950,115.64 | $3,209,133.31 | $3,311,060.72 | $2,971,795.84 | $3,213,854.38 | $3,332,387.37 |
| Notes & Accounts Receivable | 106,563.36 | 179,721.60 | 192,283.13 | 211,176.94 | 24,786.03 | 206,071.60 |
| Less Reserve | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 |
| Net notes & accounts receivable | 94,063.36 | 167,221.60 | 179,733.13 | 198,676.94 | 12,286.03 | 193,571.60 |
| Inventories | 47,619.01 | 65,765.87 | 65,719.43 | 74,390.15 | 64,950.23 | 59,929.91 |
| Investments: | | | | | | |
| Obligations of U. S., State, etc. | 1,324,531.72 | 1,344,756.72 | 1,268,756.72 | 1,261,256.72 | 1,253,756.72 | 1,200,425.00 |
| Other Securities | 7,922.34 | 7,822.34 | 7,822.34 | 7,822.34 | 7,822.34 | 7,522.34 |
| Leases | | | | | | |
| Loans secured & Unsecured | 1,212,920.99 | 1,144,166.39 | 1,482,971.09 | 1,924,048.23 | 1,811,343.23 | 1,852,786.52 |
| Less Reserve | 121,292.10 | 114,416.64 | 143,297.11 | 192,404.82 | 181,134.32 | 185,278.65 |
| Net loans secured & Unsecured | 1,091,628.89 | 1,029,749.75 | 1,289,673.98 | 1,731,643.41 | 1,630,208.91 | 1,667,507.87 |
| Land | 418,816.49 | 417,820.20 | 417,820.20 | 414,820.20 | 415,020.20 | 411,847.67 |
| Buildings | 359,644.46 | 359,644.46 | 359,644.46 | 347,818.96 | 347,818.96 | 350,255.20 |
| Machinery & Equipment | 1,925,790.78 | 1,932,612.32 | 2,094,430.16 | 2,293,959.12 | 2,479,370.34 | 2,535,444.91 |
| Furniture & Fixtures | 8,671.46 | 8,671.46 | 9,130.39 | 12,686.95 | 12,686.95 | 12,686.95 |
| Total depreciable assets | 2,294,106.70 | 2,300,928.24 | 2,463,205.01 | 2,654,465.03 | 2,839,876.25 | 2,898,387.06 |
| Less Reserve | 1,692,693.13 | 1,769,730.39 | 1,846,400.08 | 1,924,507.00 | 2,013,792.83 | 1,994,733.87 |
| Net depreciable assets | 601,413.57 | 531,197.85 | 616,804.93 | 729,958.03 | 826,083.42 | 903,653.19 |
| Dredging rights | 522,425.17 | 522,425.17 | 522,465.17 | 526,990.17 | 521,962.87 | 521,962.88 |
| Less Reserve | 348,685.16 | 348,685.16 | 348,685.16 | 352,097.16 | 359,054.16 | 363,685.16 |
| Net dredging rights | 173,740.01 | 173,740.01 | 173,780.01 | 174,893.01 | 162,908.71 | 158,277.72 |
| Goodwill Columbia Sand & Gravel Co. | 293,521.65 | 293,521.65 | 293,521.65 | 293,521.65 | 293,521.65 | 293,521.65 |
| Prepaid Insurance | 545.15 | 149.80 | ...... | ...... | ...... | ...... |
| Deposit (new scows) | ...... | ...... | ...... | ...... | ...... | 43,235.21 |
| Total Assets | $7,003,917.83 | $7,240,879.10 | $7,624,693.11 | $7,858,778.29 | $7,880,412.59 | $8,271,879.53 |

506

■■■■■■■■

| Liabilities & Capital | Dec. 31, 1945 | Dec. 31, 1946 | Dec. 31, 1947 | Dec. 31, 1948 | Dec. 31, 1949 | Dec. 31, 1950 |
|---|---|---|---|---|---|---|
| Accounts Payable | $ 1,092.59 | $ 1,446.25 | $ 1,275.17 | $ 1,253.22 | $ 330.46 | $ 9,573.61 |
| Bonds & Notes | 615,500.00 | 615,500.00 | 615,400.00 | 615,500.00 | 615,500.00 | 615,500.00 |
| Reserve for insurance replacements & contingencies | 4,298,728.25 | 4,347,084.39 | 4,464,566.42 | 4,623,732.11 | 4,566,666.38 | 4,738,103.32 |
| Replacement reserve Sand & Gravel Capital Stock (300 Com. Sh. of no par value) | ...... | ...... | ...... | ...... | ...... | ...... |
| Surplus | 2,088,596.99 | 2,276,848.46 | 2,543,351.52 | 2,618,292.96 | 2,697,915.75 | 2,908,702.60 |
| Total Liabilities and Capital | $7,003,917.83 | $7,240,879.10 | $7,624,693.11 | $7,858,778.29 | $7,880,412.59 | $8,271,879.53 |

| Summary of Reserves | 1945 | 1946 | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|---|---|
| Reserve for accrued interest (Bond Issue) | $ 652,133.29 | $ 689,063.29 | $ 725,993.29 | $ 762,923.29 | $ 799,853.29 | $ 836,783.29 |
| Reserve for Contract Bonds | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 |
| Reserve for Workmen's Compensation Insurance | 150,000.00 | 150,000.00 | 150,000.00 | 200,000.00 | 200,000.00 | 200,000.00 |
| Reserve for public liability | 100,000.00 | 100,000.00 | 100,000.00 | 200,000.00 | 200,000.00 | 200,000.00 |
| Reserve for fire and tornado insurance | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 |
| Reserve for sand & gravel replacement | 100,000.00 | 100,000.00 | 100,000.00 | 100,000.00 | 100,000.00 | 100,000.00 |
| Reserve for purchase of concrete mixing equipt. | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 |
| Reserve for 1941 income taxes | 3,974.55 | 3,974.55 | 3,974.55 | 3,974.55 | 3,974.55 | ...... |
| Reserve for Columbia Company good will | 293,521.65 | 293,521.65 | 293,521.65 | 293,521.65 | 293,521.65 | 293,521.65 |
| Reserve for 1942 income taxes | 16,663.61 | 16,663.61 | 16,663.61 | 16,663.61 | ...... | ...... |
| Reserve for new Southeast plant | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 |
| Reserve for post war rehabilitation | 1,333,000.00 | 1,333,000.00 | 1,333,000.00 | 1,333,000.00 | 1,333,000.00 | 1,333,000.00 |
| Reserve for excess profits tax, post war credit | 26,134.21 | 26,134.21 | 26,134.21 | 26,134.21 | 26,134.21 | ...... |
| Reserve for D. C. income tax 1945 | 10,333.75 | ...... | ...... | ...... | ...... | ...... |
| Reserve for Federal income tax 1945 | 112,967.19 | ...... | ...... | ...... | ...... | ...... |
| Reserve for D. C. income tax 1946 | ...... | 11,745.36 | ...... | ...... | ...... | ...... |
| Reserve for Federal income tax 1946 | ...... | 122,981.72 | ...... | ...... | ...... | ...... |
| Reserve for D. C. income tax 1947 | ...... | ...... | 18,977.52 | ...... | ...... | ...... |
| Reserve for Federal income tax 1947 | ...... | ...... | 196,301.59 | ...... | ...... | ...... |
| Reserve for D. C. income tax 1948 | ...... | ...... | ...... | 16,456.17 | ...... | ...... |
| Reserve for Federal income tax 1948 | ...... | ...... | ...... | 171,058.63 | ...... | ...... |
| Reserve for D. C. income tax current yr. | ...... | ...... | ...... | ...... | 10,536.08 | 19,608.22 |
| Reserve for Federal income tax current yr. | ...... | ...... | ...... | ...... | 99,646.60 | 255,190.16 |
| Total | $4,298,728.25 | $4,347,084.39 | $4,464,566.42 | $4,623,732.11 | $4,566,666.38 | $4,738,103.32 |