TRI-CITY ADVERTISING, Inc., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tri-City Advertising, Inc. v. Commissioner
Docket No. 36277-85.
United States Tax Court
T.C. Memo 1988-19; 1988 Tax Ct. Memo LEXIS 19; 54 T.C.M. (CCH) 1537; T.C.M. (RIA) 88019; January 14, 1988. John Y. Merrell and John C. Donovan, for the petitioner. Richard J. Wood, for the respondent. SCOTT
MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for its fiscal years ending March 31, 1981, March 31, 1982 and March 31, 1983 in the amounts of $ 13,014.29, $ 8,806.47, and $ 13,209.30, respectively. The only adjustment in the notice of deficiency *21 to which error is assigned in the petition is petitioner's liability for the accumulated earnings tax imposed by section 531. [1] The issues for decision are: (1) Whether petitioner accumulated earnings and profits beyond the reasonable needs of its business, and (2) Whether petitioner was formed or availed of for the purpose of avoiding income tax with respect to its shareholders. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized on October 15, 1973 under the laws of the State of Tennessee. At the time of filing of the petition herein and during the years in issue, petitioner's principal place of business was Kingsport, Tennessee. Petitioner filed Federal corporate income *22 tax returns with the Internal Revenue Service Center in Memphis, Tennessee on the cash method of accounting for its taxable years ending March 31, 1981, 1982 and 1983. Petitioner has since its incorporation been engaged in the business of selling advertising novelties to other businesses. Prior to October 15, 1973, the business thereafter conducted by petitioner has been carried on as a proprietorship by Robert J. Seale (Mr. Seale). A large portion of the sales made by the proprietorship and by petitioner were to banks and other financial institutions. Mr. Seale (or another Tri-City salesman) would visit the customers or potential customers to obtain orders for the advertising novelties sold by petitioner. Mr. Seale would generally forward these orders to the manufacturer of the product and the manufacturer would supply the product directly to the customer. Mr. Seale would bill the customer for the product and pay the manufacturer. Although petitioner was authorized to issue 1,000 shares of stock, at all times pertinent to this case there was issued and outstanding only 510 shares which were owned by Mr. Seale and his wife Anna H. Seale (Mrs. Seale). Mr. and Mrs. Seale resided *23 in Kingsport, Tennessee at all times pertinent to this case. [3]
Bobby Seale, the son of Mr. and Mrs. Seale, was during all of the years here involved a full-time officer and employee of petitioner. From October 31, 1973 until December 14, 1984, the officers of petitioner were as follows: Mr. Seale, president; Bobby Seale, *24 vice-president; Mrs. Seale, secretary-treasurer. Those three individuals served as the directors of the corporation and made all its decisions at all times pertinent to this case. During the three years in issue, the compensation paid to the three officers and directors of Tri-City were as follows: 3-31-81
3-31-82
3-31-83
Robert J. Seale
$ 34,000
$ 34,000
$ 27,000
Bobby Seale
15,243
18,255
21,203
Anna H. Seale
None None None Total        $ 49,243
$ 52,255
$ 48,203
The sales and taxable income of petitioner for the taxable years indicated were as follows: Fiscal Year
Taxable
Ended March 31
Sales
Income
1980
$ 670,101
$ 49,112
1981
714,826
80,503
1982
786,179
46,198
1983
826,918
92,506
The assets, liabilities and stockholder's equity of petitioner as of March 31, 1981,1982, and 1983, were as follows: Tri-City Advertising, Inc.
Balance Sheet
Assets
3/31/81
3/31/82
3/31/83
Cash
$ 178,635.71
$ 108,530.66
$ 213,576.31
Loan to stockholders
29,092.91
51,334.02
52,638.61
Loan to Bobby Seale
38,540.37
34,540.37
30,540.37
Investment in bank stock
-0-   53,100.00
60,100.00
Depreciable assets (net)
12,380.76
15,797.98
20,726.90
Estimated income tax
payments  2,600.00
19,008.00
5,000.00
Total assets
$ 261,249.75
$ 282,311.03
$ 382,582.19
Liabilities & Equity
Current liabilities
$ 14,396.04
$ 1,571.54
$ 5,638.23
Accrued profit sharing
-0-
-0-
14,097.63
Capital stock
7,650.00
7,650.00
7,650.00
Retained earnings
239,203.71
273,089.49
355,196.33
Total liability
& equity  $ 261,249.75
$ 282,311.03
$ 382,582.19
*25 Petitioner's retained earnings as of March 31, 1980 were $ 181,334.40. As of March 31, 1981 through 1983, inclusive, petitioner had net profits (after taxes) of $ 61,868.99, $ 38,342.60 and $ 70,254.75, respectively. For the years ending March 31, 1981, 1982 and 1983, petitioner had $ 136,085.62, $ 109,910.69 and $ 171,567.73, respectively, on deposit in interest bearing savings accounts with commercial banks, savings and loan associations and similar financial institutions (hereinafter referred to as "banks") which were customers of petitioner. Petitioner's primary customers were and are these banks. Mr. Seale had difficulty making sales to banks when he first began operating as a sole proprietorship. On his father's advice, Mr. Seale began to open savings accounts in and purchase stock of the various financial institutions in the geographical area served by his business. Once Mr. Seale established himself as a bank customer or stockholder, his business improved and the banks became good customers. Mr. Seale continued to maintain savings accounts and to own stock in certain of these banks which were customers of petitioner following the incorporation of the business. *26 As of March 31, 1981, 1982, and 1983, Mr. Seale had approximately 137 savings accounts in banks totalling $ 75,576.99, $ 72,162.65, and $ 105,469.56, respectively. While Mr. Seale established or maintained these accounts to obtain business for petitioner, he had no set pattern for the amount deposited in each bank. He did, however, find that the amount necessary to impress a bank increased over the years. Occasionally, Mr. Seale opened accounts in banks that did not do business with him and petitioner and he would subsequently close those accounts. Petitioner occasionally lost business when it closed an account with a customer bank. However, neither Mr. Seale nor petitioner was ever a party to a sales contract which required him or it to deposit money in a bank before the bank would do business with him or petitioner. Bobby Seale was aware of his father's approach to buying stock and opening savings accounts in order to obtain business for petitioner. However, he did not have the funds available to follow the practice of his father and he believed he has lost sales because of not having an account with the bank he was soliciting for sales. Bobby Seale, one of petitioner's *27 four full-time salesmen, was able to make sales to banks in isolated geographic areas where there was less competition from other salesmen without having accounts or stock ownership in the institution. Some of Bobby Seale's customers are banks where either his father or petitioner have accounts. He has found it easier to deal with these banks. Petitioner did not declare or pay any dividends to its shareholders from the time of its incorporation in 1973 through the years in issue in this case. During the fiscal year ended March 31, 1980 Bobby Seale was loaned approximately $ 40,000 by petitioner. As of March 31, 1983 there was a balance due of $ 30,540.37 on this amount. Bobby Seale made regular payments on this loan and it was, subsequent to the years here in issue, paid back in full. During its fiscal years 1981, 1982, and 1983, petitioner had working capital requirements of $ 79,781, $ 99,811 and $ 121,405, respectively. [4]
When Mr. Seale began his business *28 in the mid 1950's he operated it from his automobile. Later he operated the business from a room or rooms in his home. Mr. Seale pursued a policy of paying cash for both business and personal purchases. In 1967 Mr. Seale moved his family and his business operations to a house some 6 to 8 miles from downtown Kingsport. He paid between $ 50,000 and $ 60,000 cash for this house. Initially the business shared the basement level of the house with family living space but eventually the business overtook the entire basement level. This house was located on a steep mountain-side residential street which made it difficult for deliveries to be made, for shipments to be made and inconvenient for customers to come to the premises. As petitioner's business grew, more samples and products for delivery were kept on hand by petitioner, and Mr. Seale became aware that the business needed additional space. Between 1977 and 1979 Mr. Seale started looking for a new location for petitioner's business. After seeing some two to three dozen properties, Mr. Seale realized he did not have the time to find a suitable property so he asked a friend, Paul E. Jeter (Mr. Jeter) to help him find a suitable *29 property. Mr. Jeter, who is not and was not a real estate agent, agreed at least prior to late 1981 to help Mr. Seale find suitable property for petitioner's new office. Mr. Seale told Mr. Jeter he needed more room for petitioner's business, needed to "get off the hill," and wanted a location close to the main road which was easy both for manufacturers and customers to reach. When Mr. Jeter saw property which he thought might be suitable, he and Mr. Seale would drive by to see it. Mr. Jeter found two or three specific properties that Mr. Seale considered. These included an insurance agent's office and a truck terminal, both of which Mr. Seale rejected. Mr. Jeter finally located two lots which petitioner purchased for $ 15,000 each. Mr. Seale subsequently learned that the adjacent lot with a grocery store building upon it was for sale. On April 23, 1984 petitioner purchased the adjacent lot and the store building for $ 95,000. Petitioner remodeled the building at a cost of $ 190,000 and in May of 1986 moved its business into its new premises. While Mr. Seale did not have an exact estimate for the cost of purchasing the land and constructing a building for petitioner, he *30 had expected it to be in a range between $ 250,000 to $ 300,000. Petitioner also purchased the three lots adjoining the building it purchased and a service station building for $ 100,000. The service station was leased out and is not used in petitioner's business. ULTIMATE FINDINGS OF FACT (1) The reasonable needs of petitioner's business for working capital and its need for available funds to purchase land and a building for operating its business as of March 31, 1981, March 31, 1982 and March 31, 1983 were $ 329,181, $ 349,811 and $ 371,405, respectively. (2) A reasonable need of petitioner's business was to keep funds on deposit with banks which were its customers. OPINION Section 531 provides for the imposition of a tax (in addition to the other taxes imposed by chapter 1) on the accumulated taxable income on every corporation described in section 532. Section 532(a) describes those corporations subject to the accumulated earnings tax as every corporation (unless otherwise excepted) "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders *31 or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed." Section 533(a) creates a presumption of tax avoidance where the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business. Petitioner's primary content is that in none of the years here in issue did its accumulated earnings and profits exceed the reasonable needs of its business. Petitioner also contends that the preponderance of the evidence demonstrates that it did not have a tax avoidance purpose. Section 1.533-1(a)(1), Income Tax Regs.The existence of a tax avoidance purpose is determined from the facts and circumstances in each case. Section 1.533-1(a)(2), Income Tax Regs.
The accumulated taxable income is generally defined by section 535(a) as taxable income adjusted, less the dividends paid deduction and the accumulated earnings credit. [5]
*32 In determining the reasonable needs of the business section 537 authorizes the inclusion of the reasonably anticipated needs of the business. The regulations under section 537 sanction the use of a reasonably prudent businessman's standard in determining whether the accumulation exceeds reasonable needs. [6] Petitioner contends that it had current reasonable business needs for working capital and to keep funds on deposit in banks to facilitate its sales and anticipated needs for expansion plans which were specific, definite, and feasible, during the years here in issue. *33 Petitioner's position is that the account balances as of March 31, 1981, 1982 and 1983, respectively, of $ 136,086, $ 109,911 and $ 171,568 were necessary to its business success as Mr. Seale believed these deposits encouraged and vastly improved petitioner's sales. Petitioner argues that the Court should not substitute its judgment for that of petitioner's chief executive, Mr. Seale, and one of its directors. Respondent does not disagree with petitioner's position that the Court should not substitute its judgment for that of a corporation's officers and directors. However, respondent contends that that judgment must be tested by the standard of what would be done by a reasonably prudent businessman. Respondent argues that petitioner has presented no evidence to show that a reasonable businessman would need savings account deposits in order to do business with banks. Petitioner points to the difference in the amount of petitioner's sales to banks in which petitioner or Mr. Seale had savings accounts or owned stock and its sales to banks in which no accounts were maintained or stock owned as evidence of the business need of petitioner to maintain savings accounts with customer *34 banks. [7]
Petitioner has made no statistical showing of the number or size of the banks in the groups where it maintained accounts or those where it did not. However, Mr. Seale testified at length of the better approach to a customer bank where petitioner was also a customer of the bank. [8]
*35 Petitioner argues that we should defer to the actions of the corporation's directors since there is evidence to support the judgment that the accounts are necessary to promote sales and that maintaining these accounts should be considered a reasonable business need. Petitioner points out that respondent recognizes as justification for an accumulation the need to meet the competition, and the possible loss of a principal customer. In our view Mr. Seale's opinion is entitled to great weight and we are hesitant to displace his business judgment with our own. Faber Cement Block Co. v. Commissioner,50 T.C. 317, 329 (1968); John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 468 (1965); Crawford County Printing and Publishing Co. v. Commissioner,17 T.C. 1404, 1414 (1952). We find Mr. Seale's judgment to be acceptable under the reasonably prudent businessman's standard advocated by respondent and the regulations. See John P. Scripps Newspapers v. Commissioner, supra. As petitioner points out, it is difficult to argue with Mr. Seale's and petitioner's record of success. From a small sole proprietorship *36 originally operated out of the trunk of a car, the business has grown into one with yearly sales in the hundreds of thousands of dollars. Mr. Seale's decision to follow his father's advice and place funds into savings accounts with banks proved to be a dramatic turning point for his business and appears to be one of the reasons for its continued success. On the basis of this record we conclude that maintaining relatively small accounts with numerous banks was a reasonable need of petitioner's business. The more difficult question is the exact amount of retained earnings necessary to meet the reasonable anticipated need of petitioner's business for a new office and the agreed amount of its need for operating capital, we need not make an exact determination of the amount needed to maintain accounts in customer banks. Respondent argues that petitioner has not shown a reasonably anticipated need for funds for expansion ( section 1.537-1(b), Income Tax Regs.) since its expansion plans for its business were not specific, definite, and feasible. It is respondent's position that petitioner's only action toward expansion was its "search" for property, which did *37 not include a cost analysis. Respondent contends that petitioner failed to produce evidence of inquiries made to property owners. Respondent concludes that petitioner's "search" evidences mere speculation, on Mr. Seale's part, and a vague, indefinite plan, rather than the specific, definite, and feasible plans required by the regulations. From this respondent concludes that petitioner's accumulation for its alleged "expansion" are not a reasonably anticipated need of the business. Respondent recognizes that by their nature closely held corporations are not held, nor should they be, to the same standard of corporate formalities as publicly held corporations. John P. Scripps Newspapers v. Commissioner, supra. On the other hand a closely held corporation may not simply justify its expansion plans with an assertion of its intention to expand. Hogg's Oyster Co. v. United States,676 F.2d 1015 (4th Cir. 1982). A taxpayer must provide some evidence of having taken steps to fulfill its intention. Smoot Sand & Gravel Corp. v. Commissioner,274 F.2d 495 (4th Cir. 1960), *38 cert. denied 362 U.S. 976 (1960); Hogg's Oyster Co. v. United States, supra.Respondent contends Smoot Sand & Gravel Corp. v. Commissioner, supra and Bahan Textile Machinery Co. v. United States,453 F.2d 1100 (4th Cir. 1972), require that specific, definite, and feasible plans exist contemporaneously with the years in issue. For reasons stated herein we conclude that the evidence establishes that petitioner had such a plan during the years here in issue. Respondent relies on Doug-Long, Inc. v. Commissioner,72 T.C. 158 (1979); GDP, Inc. v. Commissioner,60 T.C. 480 (1973), revd. on another issue 508 F.2d 1076 (6th Cir. 1974); I. A. Dress Co. v. Commissioner,32 T.C. 93 (1959), affirmed 273 F.2d 543 (2d Cir. 1960), cert. denied 362 U.S. 976 (1960), and several Memorandum Opinions of this Court to support his argument that petitioner's simple observation of potential locations is insufficient to satisfy the section 537 specificity requirements. In Doug-Long, Inc. v. Commissioner, supra, this Court *39 concluded that the taxpayer's plans were not sufficiently definite and feasible to justify the accumulations. In that case the taxpayer did make a cost inquiry but as a result abandoned hope of carrying out the plan in its entirety. The taxpayer, a gasoline retailer, realized that even if it had purchased gasoline during the oil crisis of the 1970s at the cost available he could not afford to transport and store the quantity of gasoline which he would be required to purchase. "Mere discussions of ideas, and obtaining cost estimates, are not definite plans within the meaning of section 537." Doug-Long, Inc. v. Commissioner, supra, the taxpayer's plans never progressed beyond the talking stage we have found as a fact that petitioner's plans had so progressed as early as 1979. In Doug-Long, Inc. v. Commissioner, supra, we concluded that the alleged "plans" were simply the recognition of a potential need to expend in the future. On the facts in the instant case we conclude that petitioner's contemporaneous conduct in connection with finding a new location, *40 including asking Mr. Jeter for help in locating such property, viewing various properties, purchasing lots and the grocery store building and finally renovating that building to meet its needs, is sufficient evidence to show that the accumulation for a new location for its business was an accumulation for an anticipated business need. Neither is this case analogous as respondent contends to I. A. Dress Co. v. Commissioner, supra. Respondent argues that the I. A. Dress Co. case requires an agreement to purchase during the year in issue. There the taxpayer alleged the need to accumulate funds so as to be able to purchase the land and building which it leased. The taxpayer's business was the leasing of that building to other business enterprises. We concluded the accumulation was not reasonable since in 1949 there was no option for the taxpayer to purchase and no apparent agreement that one would be reached, and that since the lease as it existed at that time had a number of years remaining prior to expiration the taxpayer would not be forced to go out of business without the purchase. Perhaps most important was the fact that the taxpayer had leased this same *41 property since 1924 while continuing to accumulate a surplus without purchasing a single piece of property. Certainly an agreement to purchase existing in the year in issue would be evidence of contemporaneous conduct directed toward the expansion plans. Section 1.537-1(b)(2), Income Tax Regs. However, the regulations authorize us to look at subsequent events which in this case confirmed petitioner's plans. In addition, petitioner's actions over the years exhibited a consistent pattern of moving to larger quarters when the business had outgrown its present location. Consequently we find I. A. Dress Co. v. Commissioner, supra, to be distinguishable from this case. Similarly in GPD, Inc. v. Commissioner, supra, the taxpayer, an automotive parts manufacturer, had discussions with General Motors which ended in 1963 regarding the expansion of its business. In 1968 these discussions resumed briefly but were primarily on behalf of one of the taxpayer's subsidiaries. We found there was no reasonable basis to expect that the taxpayer would obtain the additional business it sought and that the "plans" were "at best * * * vague and indefinite *42 and no more than exploratory in nature." GPD, Inc. v. Commissioner, supra at 495. [9]
Petitioner contends its expansion plan was sufficiently specific, definite, and feasible to fall within the parameters of reasonably anticipated need. Petitioner argues that in determining the reasonably anticipated needs under section 1.537-1(b)(1), Income Tax Regs., the test the court should apply is a practical one. Under the test we would look to whether *43 or not the expansion was a real consideration and not just an afterthought. Mr. Seale's uncontradicted testimony is that he knew that he would have to expand and began talking about this with his family. By the late 1970s the plans had progressed beyond merely talking and Mr. Seale asked a friend to help him locate suitable property. After viewing a variety of available properties during the years in issue, he purchased two lots in 1984 and subsequently an adjoining lot with building. The subsequent events, occurring for the most part prior to the audit and notification of intent to assert the accumulated earnings tax are relevant to our determination of whether Mr. Seale and petitioner intended to consummate their plans. Section 1.537-1(b)(2), Income Tax Regs. These actions in conjunction with Mr. Seale's cash only policy served to provide the requisite substantial steps aimed at fulfillment and justify the cash accumulation of $ 250,000 for expansion purposes. The fact that Mr. Seale chose to do business with a cash policy and to accumulate cash for expansion purposes rather than borrow should not in and of itself be a reason to impose the accumulated *44 earnings tax on petitioner. John P. Scripps Newspapers v. Commissioner, supra.Based on the facts in this case, we conclude that petitioner's plans were not merely an afterthought to justify the accumulation, but were specific and definite plans for a business need of petitioner which justified the accumulation. Petitioner herein selected the location it chose from a number of sites which Mr. Seale viewed. In Mr. Seale's opinion the selected location was the best site available for petitioner's purpose. Petitioner was able to accomplish its expansion goals with a lesser outlay by purchasing and renovating the building it chose than would have been necessary to construct new facilities. Petitioner does not seek to justify the entire actual cost of its facilities but only $ 250,000. Based on the record in this case, we conclude that petitioner's plan was sufficiently specific, definite, and feasible to justify an accumulation of earnings and profits of $ 250,000 for the reasonably anticipated needs of its business. The accumulated earnings credit encompasses working capital *45 needs, current reasonable needs, and reasonably anticipated needs of a business. Petitioner's working capital needs and reasonably anticipated needs exceed its accumulated earnings and profits for each year here in issue. We, therefore, conclude that petitioner did not accumulate its earnings and profits beyond the reasonable needs of its business and is not liable for the tax imposed by section 531. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated to the contrary, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Because of uncontested adjustments in the notice of deficiency, some of which are favorable to petitioner, petitioner claims an overpayment of tax in each of the years here in issue. ↩
3. Pursuant to section 534 respondent on September 28, 1984 mailed to petitioner a notice of the proposed levy of accumulated earnings tax and notice of the right to establish justification for that accumulation. On November 23, 1984, petitioner responded to this notice listing as grounds for the accumulation: (1) the need to retain corporate earnings in savings accounts in order to obtain and retain sales with customer institutions; (2) institutions and owning stock in customer institutions prior to incorporation; (3) that corporate loans were made to provide incentive for Robert J. Seale, II (Bobby Seale) to maintain his employment with petitioner; and (4) the anticipated construction of new business premises. However, at the trial petitioner conceded that it had the burden of establishing the amount of the reasonable needs of its business in this case. ↩
4. These amounts were stipulated by the parties to be the working capital needs of the business and were arrived at by a formula based on that used in Bardahl v. Commissioner,T.C. Memo. 1965-200↩. 5. Section 535(c) defines the accumulated earnings credit as: (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b)(6) [allowing a deduction for net capital gain]. For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561↩) for such year. 6. Section 1.537-1(a), Income Tax Regs., states in pertinent part as follows: An accumulation of the earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business. The need to retain earnings and profits must be directly connected with the needs of the corporation itself and must be for bona fide business purposes. * * * Section 1.537-1(b), Income Tax Regs., dealing with reasonably anticipated needs states in pertinent part as follows: (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. (2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. * * * ↩
7. Petitioner refers to the following figures: ↩
1981
1982
1983
Total
Total sales
to transfer  $ 287,738
$ 373,488
$ 469,830
$ 1,131,056
Sales where accounts
maintained  256,929
343,928
413,009
1,013,866
Sales where accounts
not maintained  30,809
29,560
56,821
117,190
Difference
226,120
314,368
356,188
896,676
8. Respondents cites Federal Ornamental Iron and Bronze Co. v. Commissioner,T.C. Memo. 1969-72 (Federal), for the proposition that a taxpayer is required to show an extraordinary relationship with a bank and a correlation between account balances and sales to that bank in order to show that maintaining an account in a bank is a reasonable need of its business. Petitioner contends that respondent has misconstrued Federal. We agree with petitioner that Federal does not hold as a matter of law that an extraordinary relationship and sales to account balance correlation are prerequisites to a showing that maintaining bank accounts can be a reasonable need of a business. In Federal, both the taxpayer and its controlling shareholder maintained significant savings accounts with two or three customer banks. In this case Mr. Seale and petitioner maintained accounts in over 130 banks. We found in Federal that there was no evidence of a particular relationship between the taxpayers and the banks or a sales to account balance correlation but did not hold that such a relationship and correlation were prerequisites to a finding of reasonable need. Rather, on all the evidence in Federal we concluded that Federal's accounts were not necessary for it to obtain contracts and orders from the banks. One fact on which our conclusion was based was that Federal's principal customer, Bank of America, contracted for work on its properties through a subsidiary, Continental Service Corporation (CSC), which negotiated contracts for Bank of America work on a competitive basis. Another factor considered was that Federal, a manufacturer of ornamental iron and bronze fixtures for banks, owned the only patterns for certain fixtures regularly purchased by Bank of America, indicating that it would obtain that business whether or not it maintained an account with the bank. Numerous other facts distinguish the two cases. For this reason, in our view the decision in Federal↩ is not helpful in the disposition of this case. 9. See also Union Offset, A Corporation v. Commissioner,T.C. Memo. 1977-47, affd. per curiam 603 F.2d 90↩ (9th Cir. 1979), in which the taxpayers' explanation for an expansion accumulation was rejected. There we found the taxpayer anticipated the acquisition of real estate but at some indefinite point in time, and failed to identify to any specific degree the type of real estate investment sought or the scope or cost of the plan. In comparison, we know of Mr. Seale's willingness as early as 1981 to acquire property as soon as he found it, that the property acquired as to be for the business premises of petitioner, and that he anticipated the cost at $ 250,000 to $ 300,000.