K O M A, Inc. v. COMMISSIONER OF INTERNAL REVENUE.

TULSA BROADCASTING CO. v. COMMISSIONER OF INTERNAL REVENUE.

Nos. 4168, 4169.

United States Court of Appeals, Tenth Circuit.

May 16, 1951.

14. In the Matter of the S. S. "Australind," 2 I. & N.Dec. 623, 626.

James D. Fellers, Oklahoma City, Okl., and L. Karlton Mosteller, Oklahoma City, Okl. (John C. Andrews, Washington, D. C., on the brief), for petitioners.

Irving I. Axelrad, Washington, D. C. (Theron Lamar Caudle, Ellis N. Slack and L. W. Post, Washington, D. C., on the brief), for respondent.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

This is an appeal from the judgment of the United States Tax Court, approving the determination of the Commissioner that for the years 1943 and 1944 appellant taxpayers were subject to the surtax imposed by Section 102(a) of the Internal Revenue Code, 26 U.S.C.A. Internal Revenue Code, § 102(a).

Section 102(a) imposes an additional tax upon the net income of a corporation formed or availed of for the purpose of preventing the imposition of the surtax upon its stockholders or the stockholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. Section 102(c) provides that the fact that earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon the shareholders, unless the corporation by the clear preponderance of the evidence shall prove to the contrary.

## KOMA

KOMA, an Oklahoma corporation, is engaged in the broadcasting business. It owns and operates station KOMA at Oklahoma City. J. T. Griffin and his estate after his death, John Toole Griffin, his son, and Marjory G. Leake, his daughter, owned all of the common stock except a few qualifying shares and after 1944 owned all of its preferred stock and prior thereto all but one hundred shares thereof. Bryan Cole, who owned three qualifying shares of common stock, was Vice President of both corporations. Bryan Mathes, who owned three qualifying shares of common stock, was Secretary-Treasurer of both corporations and was also a Director of KOMA since its organization and of Tulsa since 1944. The preferred stock of KOMA had equal voting rights with the common stock. It was callable at the option of the corporation. The stockholders of KOMA and Tulsa controlled the Ogden Trust Company, Griffin Grocery Company of Arkansas, Griffin Grocery Company, Griffin Investment Company and Griffin-Goodner Grocery Company. J. T. Griffin owned about fifty-six per cent of the stock of the Griffin Grocery Company and his son and daughter owned all except eleven of the remaining shares in substantially equal amounts.

Prior to March, 1941, KOMA was operating AM broadcasting facilities on 1480 kilocycles with 5 kilowatts of power. In January, 1940 it applied to the Federal Communications Commission for permission to increase the power to 50 kilowatts on the same frequency. In March, 1940 the application was amended to change to 690 kilocycles. In March, 1941 the Commission authorized KOMA to operate on 1520 kilocycles with a non-directional antenna and the same power. KOMA filed applications later in that year to operate on 690 kilocycles with 50 kilowatts of power during the day and 25 at night, using a directional

antenna. In December of that year KOMA amended its application by requesting a reduction of operating power to 10 kilowatts day and night.

In April, 1942 the Commission issued an order to the effect that it would deny future applications involving the use of material to construct or change facilities of any standard television or high frequency broadcasting station. Provision was made in the order for prosecution of pending applications, but failing to do so by June 1, 1942 was to be regarded as an abandonment of the application. This order remained in effect until August, 1945.

In November, 1945 the Commission granted an application filed October 4, 1945 to increase the power to 50 kilowatts on 1520 kilocycles, with directional antenna, and since January, 1947 KOMA has been operating on that power and frequency. The change was made in AM facilities at a cost of $186,030.37 in 1946 and $31,061.23 in 1947.

In 1940 the Commission first made allocations of electrical power for commercial use of frequency modulation (FM) and experimental operation of television. Television was in its experimental stages in 1943 and 1944. The art of television broadcasting remained practically stationary during the last war. At various times prior to and during the taxable years in question, Bryan Mathes and Bryan Cole discussed with the chief engineers and general managers of both KOMA and Tulsa the question whether they should eventually extend their facilities to include operation with FM and TV. The chief engineer of Tulsa estimated in 1942 that cost of facilities for broadcasting on FM and with TV would be from $250,000 to $500,000. In 1940 the chief engineer of KOMA guessed that the facilities for FM would cost from $160,000 to $200,000 and TV about $250,000. In 1943 and 1944 the manager of KOMA estimated that the cost for FM and TV would be a total of from $300,000 to $400,000, or more. One of the estimates made by directors of Tulsa was that the loss from

operating of FM and TV would be $80,000 a year for from three to five years. No formal action was taken by the board of directors of either corporation prior to or during the taxable years to engage in FM or TV operations. In July, 1945 KOMA, pursuant to authority by its directors on April 3, 1945, first made application to the Commission for permission to construct and operate a FM station and applied for use of 50 kilowatts of power, at an estimated installation cost of $112,000. It was estimated in the application that operation costs would be $6,000 a month at the outset and $10,000 a month under normal conditions and that the income would be $15,000 a month at the end of three years. The final permit to operate FM was granted in July, 1946. Under an option granted by the Commissioner in 1947, KOMA acquired at a cost of $17,845.71 a 1 kilowatt transmitter for operation until a 50 kilowatt transmitter became available and started broadcasting in March, 1948. Other costs in 1947 for FM were $816.26. Delivery of a 50 kilowatt transmitter was not expected until January 1, 1949.

In July, 1948 KOMA, in accordance with a resolution passed by its directors on July 2, 1948, applied to the Commissioner for permission to operate a commercial TV station. No action had at the time of this trial been taken by the Commissioner under this application. It was estimated in the application that the cost of necessary equipment would be $238,925 and that the operating losses the first year would be $35,000. No TV equipment was available until 1948. Co-axial cables used to convey television programs were not available until 1950.

The surplus from earnings of KOMA increased from $30,000 at the close of 1938 to $130,270 at the close of 1942. In 1943 its surplus was $163,382 and in 1944 it was $210,404. In 1943 its net earnings were $36,382 and in 1944 they were $48,263. Its assets, current liabilities, capital stock and surplus, omitting cents, at the close of each year 1943 to 1947, inclusive, and net

earnings each year were as set out in footnote one.[1]

Among its current assets for 1943, 1944 and 1945 were demand notes from the Griffin Grocery Company in the amounts of $30,000, $65,000 and $50,000, respectively. The note outstanding at the close of 1943, bearing interest at 1½%, was a renewal of demand loans made in 1941 and 1942 at 2% interest. The notes outstanding at the close of 1944 consisted of the 1943 note and a new demand note made on July 26, 1944 in the amount of $35,000 at 1½% interest. Each of these notes was paid on June 26, 1945. The note for $50,000 outstanding at the close of 1945 represents a loan made on July 12, 1945, with interest at the rate of 1¼% and was paid in 1946. Other demand loans at 2% interest were made in the years 1939 to 1942 to the same corporation and other companies controlled by the Griffins and were paid prior to or in 1943. KOMA paid dividends on its common and preferred stock during the years 1939 to 1943, inclusive, as shown in footnote two.[2] No dividends were paid from 1944 to 1947, inclusive. The preferred stock had a par value of $100 per share, was callable at the option of the corporation and was entitled to 6% cumulative dividends secured by a first lien on the corporation's assets. The preferred stock was retired in 1947 without payment of the accumulated dividends. To obtain funds with which to redeem the stock, KOMA borrowed $130,000 from a bank at 2½% interest. One reason for retiring the stock was to provide funds for the estate of John T. Griffin.

## TULSA.

The additional facts necessary to consider with respect to the contentions of Tulsa are these. As in the case of KOMA, the Griffins likewise owned all of the stock of Tulsa except a few qualifying shares [3]

| [1] | 1943 | 1944 | 1945 | 1946 | 1947 |
|---|---|---|---|---|---|
| Assets | | | | | |
| Current | $196,325 | $319,009 | $306,166 | $121,837 | $ 79,027 |
| Other | 295,541 | 303,262 | 302,310 | 501,226 | 458,382 |
| Current | | | | | |
| Liabilities | 65,484 | 148,868 | 102,295 | 60,591 | 149,609 |
| Capital Stock: | | | | | |
| Common | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Preferred | 258,000 | 258,000 | 248,000 | 223,000 | |
| Surplus | 163,382 | 210,404 | 253,181 | 309,472 | 357,800 |
| Net Earnings | 36,382 | 48,263 | 42,777 | 56,290 | 48,328 |

| [2] | | Preferred | Common |
|---|---|---|---|
| | 1939 | $14,718 | |
| | 1940 | 16,200 | |
| | 1941 | 12,150 | $3,000 |
| | 1942 | | 7,500 |
| | 1943 | | 3,000 |

[3] Stock ownership in Tulsa during the years in question was as follows:

| | Common |
|---|---|
| J. T. Griffin | 254 shares (a) |
| Estate of J. T. Griffin (b) | 254 shares (a) |
| John Toole Griffin | 96 shares (c) |
| Marjory G. Leake | 87 shares (d) |
| R. L. Griffin (e) | 33 shares |
| J. C. Leake | 16 shares (f) |

(a) Includes qualifying shares in name of Bryan Mathes and Bryan Cole.
(b) After death of J. T. Griffin in 1944; 204 shares in 1947 and 1948.
(c) 97 shares in 1945 and 1946 and 122 shares in 1947 and 1948.
(d) 86 shares in 1945 and 1946 and 95 shares in 1947 and 1948.
(e) Brother of J. T. Griffin.
(f) In 1947 and 1948.

Since 1940 Tulsa had operated an AM broadcasting station on 5 kilowatts, directionalized at night, and 1420 kilocycles, the maximum of its facilities. An increase in power on that frequency is not possible. In 1941 Tulsa conducted experimental operations in FM broadcasting by merely building a FM receiver and a modulator. On April 3, 1945 the directors of Tulsa, by resolution, authorized its officers to apply to the Commission for permission to operate a FM station. The application was filed in 1945 and granted in 1946 to operate with 170 kilowatts of power. It was estimated in the application that the cost of the facilities would be from $106,600 to $118,600; that the monthly cost of operation would be $5,000 and that the revenue at the end of three years would be $12,000 a month. Approval of the site selected for broadcasting was withdrawn in 1948 by the Commission and no new site has been selected. Equipment was not available to Tulsa at the time of the hearing for construction of a FM station for operation under the permit. Necessary equipment was expected January 1, 1949. Since April, 1948 it has been broadcasting temporarily on FM with a 1 kilowatt transmitter under an option granted by the Commission. Tulsa may never operate FM with 170 kilowatts of power under the permit granted by the Commission.

On June 2, 1948 Tulsa's board of directors resolved to take steps to apply for authority to construct and operate a television station. An application was made to operate a TV station, giving $219,915 as the estimated cost for installing necessary equipment and $35,000 as loss to be sustained during the first year of operation. The application is still pending. The minutes of June 12, 1948 recited a statement by James C. Leake that the board had considered a television station for a long time and that contractors and engineers estimated probable cost as $350,000 to $400,000.

Tulsa had earnings each year from 1939 to 1942, inclusive. During this period its surplus increased from about $103,000 to $190,000. Its assets, current liabilities, capital stock and surplus, omitting cents, at the close of the years 1943 to 1947, inclusive, and net earnings for each year were as set out in footnote four.[4] Its current assets included notes and accounts receivable from the Griffins and companies controlled by them as set out in footnote five.[5] The accounts at the close of 1939 to 1942, inclusive, show that J. T. Griffin was indebted to the corporation for $25,000, $24,030, $22,000 and $12,075, respectively. In January, 1948, Tulsa loaned the Griffin

| 4 | 1943 | 1944 | 1945 | 1946 | 1947 |
|---|---|---|---|---|---|
| Assets | | | | | |
| Current | $280,862 | $374,409 | $372,642 | $418,515 | $350,808 |
| Other | 56,433 | 60,515 | 37,600 | 46,815 | 92,498 |
| Current | | | | | |
| Liabilities | 69,258 | 124,779 | 67,674 | 57,495 | 18,342 |
| Capital Stock | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 |
| Surplus | 221,038 | 263,144 | 295,567 | 360,834 | 377,964 |
| Net Earnings | 30,722 | 39,868 | 32,957 | 65,267 | 17,129 |

| 5 | 1943 | 1944 | 1945 | 1946 |
|---|---|---|---|---|
| Notes | $112,000 | $152,000 | $150,000 | $150,000 |
| Accounts | | | | |
| Receivable | 16,575 | 19,352 | 16,570 | 127,070 |

The accounts receivable were, as follows:

| | 1943 | 1944 | 1945 | 1946 |
|---|---|---|---|---|
| J. T. Griffin | $ 12,075 | $ 12,070 | $ 12,070 | $ 12,070 |
| J. T. Griffin estate | | 1,079 | | |
| J. T. Griffin Guardian for John Toole Griffin | 4,500 | 4,500 | 4,500 | |
| Griffin Grocery Co. | | | | 75,000 |
| Griffin-Goodner Grocery Co. | | | | 40,000 |
| K O M A | | 1,702 | | |

Grocery Company the amount of $100,000 on open account, payable on demand.

In 1946 and 1947 Tulsa spent $14,689.91 and $32,477.52, respectively, for improvements to its leasehold. In the latter years it spent $1,500 for land and $14,729.98 for equipment for FM broadcasting.

## KOMA and TULSA.

KOMA's directors held at least six meetings in 1944 and Tulsa's at least three in that year and one in 1945. The directors in attendance at each of these meetings were Bryan Cole, Bryan Mathes and Marjory G. Leake and in addition J. T. Griffin attended the meeting held by the directors of KOMA on January 4, 1944. The absence of J. T. Griffin at other meetings was due to illness. His son was in active military duty from May, 1943 to November, 1945, and served overseas during an undisclosed portion of that period. Minutes were not written for all meetings held by the directors during 1943 and 1944. No director owning full title to stock of petitioner participated in any decision to accumulate the profits of the corporation or distribute them as dividends. Meetings of the stockholders of KOMA held on January 1, 1943 and January 4, 1944 were attended only by J. T. Griffin, Bryan Cole and Bryan Mathes. The same individuals were the sole attendants at a meeting of the stockholders of Tulsa on November 2, 1943. J. T. Griffin did not enter the office of Tulsa in Tulsa and KOMA in Oklahoma City more than two times during the taxable years and those visits were not made to discuss or transact business of the corporation. He did not during the taxable years discuss with Bryan Cole or Bryan Mathes the question as to whether or not the petitioner should declare a dividend.

Three reasons are assigned by the taxpayers for the accumulation of these net earnings. They are (1) to improve their AM broadcasting facilities, (2) to provide for the erection of FM broadcasting stations and (3) to provide for the future construction of TV broadcasting stations. The need to improve AM broadcasting facilities is stressed more by KOMA than by Tulsa. Without entering into a detailed discussion of this question, we think the findings with respect to the reasonable expectations of the possibility of improving KOMA's AM broadcasting facilities are amply sustained by the record.

While KOMA asserts that definite plans were initiated as early as 1940 and 1941, looking to the construction of FM and TV broadcasting facilities, the record does not sustain such contention. There is no evidence that either corporation prior to or during the tax years in question took any action committing either corporation to the construction of such facilities. There is no evidence that the board of directors of either corporation, prior to or during the years in question, formally or informally decided to commit funds to the construction of such facilities. The records of both are silent as to any steps taken by the boards of directors looking to such projects. The evidence most favorable to both taxpayers is that during the years in question and prior thereto Bryan Mathes and Bryan Cole discussed with the chief engineers and general managers of the taxpayers the question of whether the corporations should eventually extend their operations to include FM and TV stations. Mathes and Cole held only qualifying shares of stock in the corporations and, while the evidence indicates that they were largely in the management of the corporations during the years in question, there is nothing in such management or in the record as a whole indicating that they could commit these corporations to the expenditure of vast sums of money in a new and untried experimental field without the consent and approval of the beneficial owners of the stock of the corporations.

Whatever ideas Mathes and Cole might have had about eventually using FM and TV in the business of these taxpayers were formed without binding effect on the taxpayers and there is no showing that such ideas were communicated to the beneficial stockholders or shared by them. While Tulsa obtained a permit to erect a FM station as late as 1948, there was a question whether it ever intended to use such facilities. Thus on April 21, 1948, Tulsa's general manager and one of its vice presidents

wrote as follows: "I would like to stay away from asking for any modifications because it seems to me we will eventually want to do one of two things. Either we will want to fulfill the maximum grant which the commissioner has given us, or we will want to drop FM completely. I think we are in a position to sit back and wait for the Commission to push us from this point on. If they push us out, they will be pushing out the only decent FM operation in Tulsa."

It is also significant that during the period of time when the taxpayers are contending it was necessary to accumulate reserves for these future constructions, the corporations and these funds were availed of for the benefit of J. T. Griffin, his son and daughter, in their various other enterprises. During the years in question as well as prior and subsequent years both taxpayers loaned large sums of money to the Griffin Grocery Company, controlled by J. T. Griffin, his son and daughter. These loans were made at a 2% interest rate and renewals thereof were made at as low as 1½% and 1¼% interest. In its opinion the Tax Court found there was no showing that interest was collected on these loans when they were paid. In 1947 KOMA retired its preferred stock. All of this stock except a few shares was owned by J. T. Griffin, his son and daughter. The taxpayer was not required to retire this stock. It was retired because the Griffin estate was in need of funds. At the time of the retirement, there were unpaid accumulated dividends due on the stock. These dividends were not paid when the stock was retired. Had they been paid, they would have constituted income and would have gone to increase the income tax liability of the Griffin estate. Loaning the funds of the corporation to the beneficial stockholders at nominal rates of interest, not requiring the payment of such interest, in substance gave the stockholders the benefit of a declared dividend without the attendant tax burden resulting from a dividend payment.

At the time Cole and Mathes thought these corporations eventually might want to go into television broadcasting, television was in an experimental stage; no equipment was on the market; no co-axial cable was available prior to 1950; no one knew or could tell with a reasonable degree of certainty the cost of such a station, if and when it could be constructed, or whether it would be commercially feasible. From all of these facts and the further facts that, while the corporations contend that it was necessary to set aside these reserves for their reasonable needs in the reasonable forseeable future, they were loaning their earnings to Griffin and his other enterprises instead of declaring dividends; that KOMA retired its preferred stock when not compelled to do so for Griffin's benefit and without paying the accumulated dividends thereon, the Tax Court concluded that the two corporations were availed of for the purpose of preventing the attachment of surtaxes.

■ We are not warranted in substituting our judgment for that of the Commissioner or the Tax Court. Our review is limited to ascertaining whether there was substantial evidence to support the Commissioner's findings and the findings of the Tax Court. In doing this, we must consider and view all the facts and circumstances in the light of the setting of the taxpayers at the time in question (1943 and 1944).[6] Subsequent events are relevant only as they throw light on the period in question. Neither is it decisive whether the decisions to accumulate the income and the failure to distribute profits were wisely made. The gist of the statutory violation is the intent to use the corporation to avoid the attachment of surtaxes.[7] Viewed in

6 World Pub. Co. v. United States, 10 Cir., 169 F.2d 186, certiorari denied 335 U.S. 911, 69 S.Ct. 480, 93 L.Ed. 443; See also Mertens, Law of Federal Income Taxation, Vol. 9, Sec. 51.19 and cases cited therein for extent of review of facts by reviewing courts.

7 DeMille v. Commissioner of Internal Revenue, 31 B.T.A. 1161, 1174; Sauk Investment Co. v. Commissioner of Internal Revenue, 34 B.T.A. 732, 738; Mertens, Law of Federal Income Taxation, Vol. 7, Sec. 40.08.

this light, we think the findings and conclusions of the Tax Court find ample support in the record. The decisions appealed from are severally

Affirmed.