ELECTRIC REGULATOR CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 90576. Filed July 31, 1963.

*Robert J. Feldman,* for the petitioner.
*Albert R. Doyle,* for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in income tax against the above-named petitioner for its fiscal years ended October 31, 1957 and 1958, in the amounts of $81,751.01 and $25,944.69, respectively.

The sole issue for decision is whether the petitioner is subject to the surtax imposed by section 531 of the 1954 Code, on the ground that it was availed of during each of its said fiscal years for the purpose of avoiding the income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being divided or distributed.

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulation of facts and the exhibits identified therein are incorporated herein by reference.

The petitioner, Electric Regulator Corp., is a New York corporation which was organized in 1945. Its principal place of business is in Norwalk, Conn. At all times material it was engaged in manufacturing electric control devices. It kept its books and prepared its income tax returns on the basis of fiscal years ended October 31, and in accordance with an accrual method of accounting. Its Federal income tax return for each of the taxable years involved was filed with the district director of internal revenue at Hartford, Conn.

The sole stockholders of petitioner, at all times since its inception, have been two individuals: Arthur M. Cohen and Paul W. Fink. Cohen was at all times president and chief engineering officer, and Fink was at all times the treasurer and chief fiscal officer.

The initial capital of the corporation, all of which was invested by said two stockholders, was $2,180, represented by $180 of common stock and $2,000 of preferred stock. In about 1949 said preferred stock was retired, thereby leaving outstanding only the $180 common stock. No additional equity capital was at any subsequent time invested by either stockholder. However in 1952, the corporation increased its capital stock account from $180 to $50,000 by transferring to that account $49,820 from its earned surplus and undivided profits

and in connection therewith issued a nontaxable stock dividend to its stockholders.[1] Also, at the end of its fiscal year 1957, it further increased its capital stock account from $50,000 to $540,000 by transferring $490,000 from its earned surplus and undivided profits, and issued another nontaxable stock dividend. At all times subsequent to this second stock dividend, including the taxable years here involved, the total issued and outstanding shares of the corporation consisted of 2,700 shares of class A common stock held by Fink, and 2,700 shares of class B common stock held by Cohen.

From the time of incorporation in 1945 until September 1950, the corporation had its principal place of business in New York City. There it initially occupied space of only about 400 square feet; but in April 1948, it moved to larger quarters in New York City that provided it with about 1,200 square feet of space. In 1950 it moved its operations to Norwalk, Conn., where it rented space of about 7,500 square feet. In 1952, it built its own manufacturing plant in Norwalk, which had floor space of about 16,000 square feet. And finally in 1958, it added a second floor to its above-mentioned plant, and thereby increased its floor space to 29,000 square feet.

The principal manufactured product of petitioner at all times from its organization was an electro-mechanical voltage regulator, called Regohm. This was a patented device invented by Cohen after the inception of petitioner. But the patent was never carried by petitioner as an asset on its balance sheets; and the income statements reflect that no royalties were ever paid for the use thereof. The function of this device, in general, was to automatically correct the flow of electric current from a rotating generator of a motor, so as to compensate for changes in the speed or load of the generator. Such function was similar to that of voltage regulators used in automobiles, which permit the headlights of an automobile to retain about the same brightness regardless of changes in the speed of the vehicle, or of changes in electricity requirements caused by use of a radio, heater, or other appliance. However, Regohm was generally used on generators that were more complicated than those employed in automobiles. In appearance, the Regohm device resembled a small metal box or cube, measuring about 2 inches on all sides, from which several electrical points or connections protruded on one face. All switches, magnets, and other operating parts were self-contained. The weight of a typical Regohm was about 3 or 4 ounces; petitioner's cost for the parts thereof was about $7 or $8; and the price at which the device was sold was about $35. Due to these features, many motor manufacturers

[1] In connection with this stock dividend, the corporation's common stock was divided into class A (100 percent of which was issued to Fink) and class B (100 percent of which was issued to Cohen). Class A was entitled to only 40 percent of any dividends declared; whereas class B, issued to Cohen, was entitled to 60 percent of such dividends.

favored the Regohm device over other types of regulators that were produced by petitioner's competitors; and the manufacture and sale of this device yielded the petitioner substantial profits.

Early in the year 1955, petitioner began to develop a new product to market along with its Regohm, which was called Magohm. This was a "magnetic amplifier static regulator"—the word "static" being used to indicate that it had no moving parts. It was larger and more expensive than the Regohm. For example, one of the typical models was about 1 cubic foot in size; weighed about 35 pounds; the parts used therein cost about $100; and the device sold for about $350. Petitioner's first order for a Magohm, covering one of the smaller models, was sold in 1956.

In addition to manufacturing its Regohm and Magohm, petitioner also manufactured or attempted to develop other devices, including one called Teleregister, and another called Rotojet. The latter device proved to be a failure. The manufacture of the two regulators, Regohm and Magohm—which were sold to prime contractors for airlines, to one of the larger manufacturers of diesel electric locomotives, and to manufacturers of equipment used by the armed services—were its principal source of income.[2]

The following condensed comparative balance sheets show the financial position of petitioner (per its audited financial statements) as of October 31 for the years 1955 through 1959:

| | Fiscal year ended October 31— | | | | |
|---|---|---|---|---|---|
| | 1955 | 1956 | 1957 | 1958 | 1959 |
| ASSETS | | | | | |
| Current assets: | | | | | |
| Cash | $348,108 | $163,116 | $820,898 | $439,243 | $317,013 |
| Accounts receivable—trade (less reserve for doubtful accounts) | 85,626 | 163,229 | 144,051 | 153,020 | 137,525 |
| Merchandise inventory: | | | | | |
| Raw material | | 269,849 | 162,359 | 189,540 | 248,459 |
| Work in process | | 51,124 | 73,007 | 51,992 | 63,914 |
| Finished goods | | 32,626 | 13,211 | 22,501 | 70,727 |
| Total inventories | 116,636 | 353,599 | 248,578 | 264,033 | 383,100 |
| Prepaid insurance and other prepayments | | | 5,765 | 7,807 | 7,015 |
| Total current assets | 550,370 | 679,944 | 1,219,292 | 864,104 | 844,653 |
| Fixed assets: | | | | | |
| Land, buildings, and equipment | 238,267 | 278,379 | 357,119 | 478,094 | 560,221 |
| Less: Accumulated depreciation | 105,714 | 141,377 | 180,619 | 228,119 | 269,532 |
| Net fixed assets | 132,553 | 137,003 | 176,501 | 249,975 | 290,689 |
| Other assets | 11,555 | 16,470 | 27,908 | 24,116 | 20,942 |
| Total assets | 694,478 | 833,417 | 1,423,701 | 1,138,195 | 1,156,285 |

[2] Sales of Magohm devices accounted for approximately $6,000 of $1,462,000 sales in fiscal year 1956; $238,000 of $2,624,000 sales in fiscal year 1957; and $639,000 of $2,016,000 sales in fiscal year 1958.

| | Fiscal year ended October 31— | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1955 | 1956 | 1957 | 1958 | 1959 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current liabilities: | | | | | |
| Accounts payable—trade | $34,533 | $54,189 | $40,177 | $20,290 | $38,531 |
| Accrued expenses—payroll, etc. | 73,396 | 84,369 | 75,989 | 43,506 | 34,211 |
| Employees' withholding taxes | | | | 10,456 | 12,767 |
| Mortgage amortization payments due within 1 year | 4,494 | 4,723 | 4,963 | | |
| Federal income taxes payable | 45,464 | 85,861 | 268,949 | 72,608 | 64,305 |
| State franchise taxes | 3,808 | | 20,375 | 6,900 | |
| Payment due to profit-sharing plan | 12,272 | 42,415 | 119,616 | 43,512 | 30,882 |
| Officers' compensation payable | | | 70,500 | 54,967 | 43,382 |
| Refunds on renegotiable contracts | 12,452 | | | | |
| Total current liabilities | 186,419 | 271,557 | 600,569 | 252,240 | 224,078 |
| Fixed liabilities: | | | | | |
| Mortgage payable—due Jan. 1, 1963, less amount due within 1 year | 33,740 | 29,017 | 24,054 | | |
| Stockholders' equity: | | | | | |
| Capital stock | 50,000 | 50,000 | 540,000 | 540,000 | 540,000 |
| Earned surplus | [1] 424,319 | [1] 482,843 | [1] 259,078 | [1] 345,955 | [1] 392,206 |
| Total stockholders' equity | 474,319 | 532,843 | 799,078 | 885,955 | 932,206 |
| Total liabilities and stockholders' equity | 694,478 | 833,417 | 1,423,701 | 1,138,195 | 1,156,285 |

[1] NOTE: Since nontaxable stock dividends issued in 1952 and 1957 in the respective amounts of $49,820 and $490,000 did not reduce corporate earnings and profits, petitioner's surplus and undivided profits as of Oct. 31 of each of the above fiscal years were $474,139, $532,663, $754,191, $848,006, and $932,026, respectively, rather than the amounts shown on the above balance sheets.

Reflected in the above balance sheets are:

| Year ended October 31— | Working capital (net current assets) | Total current assets | Cash | Earned surplus [1] |
| --- | --- | --- | --- | --- |
| 1955 | $363,951 | $550,370 | $348,108 | $474,139 |
| 1956 | 408,387 | 679,944 | 163,116 | 532,663 |
| 1957 | 618,723 | 1,219,292 | 820,898 | 754,191 |
| 1958 | 611,864 | 864,104 | 439,243 | 848,006 |
| 1959 | 620,575 | 844,653 | 317,013 | 932,026 |

[1] These figures reflect the earned surplus account as adjusted by restoring the amount of the nontaxable stock dividends. See footnote to the balance sheets, *supra*.

The average monthly cash balance for its fiscal year ended October 31, 1957, was approximately $479,600; and said balance for the fiscal year ended October 31, 1958, was approximately $354,700.

The results of petitioner's operations for its fiscal years 1955 through 1959 (per its audited financial statements) were:

| | 1955 | 1956 | 1957 | 1958 | 1959 |
|---|---|---|---|---|---|
| Net sales_____ | $1,657,720 | $1,462,518 | $2,623,676 | $2,016,033 | $1,917,258 |
| Less: Cost of sales_____ | 1,148,455 | 947,086 | 1,509,260 | 1,399,118 | 1,370,998 |
| Gross profit on sales_____ | 509,265 | 515,432 | 1,114,417 | 616,915 | 546,260 |
| Less: Operating expenses_____ | 263,588 | 289,029 | 345,354 | 378,100 | 408,797 |
| Net Operating Income_____ | 245,677 | 226,403 | 769,063 | 238,815 | 137,463 |
| Other income_____ | 1,119 | 4,891 | 1,349 | 513 | 5,184 |
| Total_____ | 246,796 | 231,294 | 770,412 | 239,328 | 142,647 |
| Less: Other expenses_____ | ¹127,709 | ¹11,634 | 41,948 | 15,281 | ------------ |
| Net income before profit-sharing and State franchise and Federal income taxes_____ | 119,087 | 219,660 | 728,464 | 224,048 | 142,647 |
| Provision for taxes and profit-sharing_____ | 66,544 | 135,776 | 466,940 | 135,021 | 69,630 |
| Net Income (after taxes and profit-sharing)_ | 52,543 | 83,884 | 261,524 | 89,027 | 73,017 |

¹These items include deductions of a flood loss in 1955 of $119,221, and expenses incident to said flood of $6,466 in 1956.

The amounts of petitioner's unfilled orders at the close of the above-mentioned fiscal years were as follows:

*Fiscal year ended*
*October 31—*      *Unfilled orders*
1955 _____ $423,000
1956 _____ 1,037,000
1957 _____ 786,000
1958 _____ 738,000
1959 _____ 998,000

No taxable dividend was declared or paid by petitioner at any time during its existence.

The amounts of the salaries paid by petitioner to its officers, Arthur M. Cohen and Paul Fink, for the years 1955 through 1959, were:

| Fiscal year | Cohen | Fink |
|---|---|---|
| 1955_____ | $40,000.00 | $11,000.00 |
| 1956_____ | 67,949.01 | 26,966.01 |
| 1957_____ | 65,000.00 | 43,500.00 |
| 1958_____ | 63,607.15 | 27,404.77 |
| 1959_____ | 56,029.45 | 22,352.97 |

Both Cohen and Fink realized that if dividends had been paid by petitioner during the taxable years here involved, these dividends would have been taxed to them personally at an income tax bracket in excess of 50 percent.

During the fiscal years 1957 and 1958, petitioner had no investment in securities or other assets not directly related to its business; and also during said years, it made no loans to stockholders or members of their families, except for one loan of $3,000 to one of the stockholders in 1957 which was repaid within about 5 months.

During September and October 1957, a plan for adding a second story addition to petitioner's factory was being considered. An architect prepared preliminary sketches for such addition; and he advised one of petitioner's officers that the estimated total cost of

such addition would be approximately $125,000. Construction of the addition was commenced some time during the fiscal year ended October 31, 1958; and during said year approximately $69,000 was expended therefor. During the following fiscal year ended October 31, 1959, the construction was completed at an additional cost of approximately $40,000.

In planning for the above-mentioned addition to the factory building, it was contemplated that additional machinery, office furniture and fixtures, and other equipment would have to be acquired; and that the total cost thereof would approximate $100,000. The record does not show when this additional machinery and equipment was acquired, except that a total of approximately $52,000 was expended for such assets in the year ended October 31, 1958, and that during the fiscal year ended October 31, 1959, an additional amount of approximately $52,500 was expended for the same purpose.

During the fiscal year 1957, the petitioner made Government sales totaling $1,710,000 which were subject to renegotiation under the Renegotiation Act of 1951. At the close of said fiscal year, petitioner estimated on the basis of its experience with comparable sales in an earlier fiscal year, that the amount which it might have to refund to the Government might approximate $30,000; and the amount which it actually was required to refund with respect to the same at the close of the renegotiation proceedings in September 1959 was $26,766.38.

During the fiscal year ended October 31, 1958, petitioner made Government sales totaling $1,341,427.01, an amount sufficient to render it subject to renegotiation unless the Renegotiation Board should determine in its discretion that petitioner was exempt from such renegotiation. At the end of said fiscal year, it could not determine whether such exemption would be granted; but it estimated that if exemption were not allowed, the amount to be refunded would be approximately $20,000. Subsequently in March 1959, the Renegotiation Board granted such an exemption to petitioner; and accordingly, no amount was actually refunded in respect of Government sales made in petitioner's fiscal year 1958.

On July 20, 1960, the respondent sent to the petitioner by certified mail, pursuant to the provisions of section 534 of the Internal Revenue Code, a notification that he proposed to issue a statutory notice of deficiency for the taxable fiscal years 1957 and 1958, and that the proposed notice of deficiency would include an amount with respect to the accumulated earnings tax imposed by section 531. Thereafter, acting pursuant to section 534(c), the petitioner timely submitted to the respondent a statement (herein incorporated by reference) in which it purported to set forth the grounds on which it relied to establish that its earnings and profits had not been per-

mitted to accumulate beyond the reasonable needs of its business. Subsequent to the receipt of such statement, the respondent issued the statutory notice of deficiency for said fiscal years 1957 and 1958, in which he determined the deficiencies hereinabove mentioned, all of which deficiencies were due to the accumulated earnings taxes imposed under section 531.

### ULTIMATE FINDINGS OF FACT

During each of the taxable years involved, the petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business.

Petitioner was availed of during each of the taxable years involved for the purpose of avoiding the income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed.

### OPINION

The accumulated earnings tax imposed by section 531 of the 1954 Code applies in general, as expressly provided therein, to a corporation that is formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. See section 532. Section 533 provides in substance, that the fact that earnings and profits are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the above-mentioned proscribed purpose, unless the corporation by the preponderance of the evidence shall prove to the contrary. Section 534 then provides, in substance and so far as here material, that where the respondent has, before issuing his statutory notice of deficiency, given notice to a corporation of his intention to impose the accumulated earnings tax and the corporation has in response to such notification, submitted a statement of the grounds (together with facts sufficient to show the basis thereof) on which it relies to establish that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business—then the burden of proof with respect to whether the accumulation actually was beyond the reasonable needs of the business shall be on the respondent with respect to the grounds set forth in the statement.

In the instant case the respondent did, as we have heretofore found, send a notification to the present petitioner in accordance with the provisions of section 534; and the petitioner thereupon did submit a timely statement in which it purported to set forth certain grounds and supporting facts on which it would rely to establish that its earnings and profits had not, for the years here involved, been permitted to accumulate beyond the reasonable needs of its business.

But the respondent is here contending that the statement fails to do the job petitioner intended for it—i.e., to shift the burden of proof to the respondent—for two broad, general reasons: (1) That some of the grounds mentioned therein are insufficient as a matter of law to justify the accumulation of earnings; and (2) that the facts alleged in support of some of the grounds are too vague and indefinite to permit fixing any dollar-amount of earnings and profits required to meet the petitioner's claimed needs for accumulation of its earnings. After examining and studying the statement submitted by petitioner, and the respondent's arguments in his brief as to the claimed insufficiency of the statement, we have concluded that the statement does suffice to meet the general purpose and intent of the statute, and thereby to shift the burden of proof to the respondent with respect to the grounds alleged therein. We turn therefore to a consideration of the grounds alleged, and of all the evidence which is pertinent to such grounds.

We think it will be helpful, prior to discussing these grounds, to direct attention to a number of elementary principles regarding the accumulated earnings tax. The tax, where applicable, is laid upon the "accumulated taxable income" for the current taxable year which, painting with an extremely broad brush, may be described as the earnings and profits of such year with certain reducing adjustments (such, for example, as the Federal income taxes due on those earnings and profits; and the excess of actual charitable contributions over the amount allowed as an income tax deduction), less any dividends paid in the taxable year, and less also where applicable, an accumulated earnings credit. This accumulated earnings credit receives its statutory warrant in section 535(c) of the 1954 Code. In general, section 535(c) provides that the accumulated earnings credit shall be an amount equal to such part of the *earnings and profits of the taxable year* as are retained for the reasonable needs of the business; provided that in no event shall the amount of this credit be less than the excess, if any, of $60,000 [3] over the accumulated earnings and profits at the beginning of the taxable year. And furthermore, respondent's regulations (Income Tax Regs., sec. 1.535–3(b)(ii)) provide that:

In determining whether any amount of the earnings and profits of the taxable year has been retained for the reasonable needs of the business, the accumulated earnings and profits of prior years will be taken into consideration. Thus, for example, if such accumulated earnings and profits of prior years are sufficient for the reasonable needs of the business, then any earnings and profits of the

---

[3] The figure of $60,000 was the amount provided for taxable years beginning prior to Jan. 1, 1958. Both taxable years here involved did begin before that date. By amendment in 1958, the amount has been raised to $100,000 for taxable years beginning after Dec. 31, 1957. See Pub. L. 85–866, sec. 205(a), Technical Amendments Act, 72 Stat. 1606 (1958).

current taxable year which are retained will not be considered to be retained for the reasonable needs of the business. * * *

Thus it will be seen that, if the earnings and profits of the *current year* are required to be retained for the reasonable needs of the business, this may provide a possible shield against imposition of the accumulated earnings tax. But on the other hand, if the reasonable needs of the business can be satisfied from earnings and profits already accumulated in prior years, there is no necessity for retaining any portion of the current year's earnings and profits to satisfy such needs. Hence, if that is true the earnings and profits of the current year may be found to be accumulated beyond the reasonable needs of the business, and the right to any credit based upon the reasonable needs of the business may be destroyed.

From what has been said above, it is at once apparent that the size of the accumulated earnings and profits from prior years (often called earned surplus or, simply, surplus) is an important factor. Yet, such surplus cannot be viewed in isolation. The Court of Appeals for the Fourth Circuit made this clear with the following statement (*Smoot Sand & Gravel Corporation* v. *Commissioner*, 274 F. 2d 495, 500–501, affirming a Memorandum Opinion of this Court, certiorari denied 363 U.S. 832) :

Thus, the size of the accumulated earnings and profits or surplus is not the crucial factor; rather, it is the reasonableness and nature of the surplus. Part of the surplus may be justifiably earmarked in the form of reserves, for specific, necessary business needs.[3] Again, to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity. * * * Where, on the other hand, the accumulation of surplus is reflected in liquid assets in excess of the immediate or reasonably foreseeable business needs of the corporation, there is a strong indication that the purpose of the accumulation is to prevent the imposition of income taxes upon dividends which would have been distributed to the shareholders. * * * [Footnote omitted.]

From the foregoing, we deduce that we must first ascertain what are the reasonably anticipated needs of the business; next we must ascertain whether the accumulated earnings and profits of prior years are sufficient in amount to cover those needs; and finally, if the prior years' earnings and profits are found to be sufficient in amount, then did the taxpayer-corporation have sufficient liquid assets to meet the reasonable needs and still permit a distribution as a dividend to its shareholders.

Re: *Petitioner's fiscal year ended October 31, 1957.*

Petitioner's grounds as set forth in its statement for accumulating the earnings and profits of this year amounting to some $261,500 after taxes, are essentially four in number. These grounds may be summarized as follows:

1. That petitioner required funds for the expansion of its building ($100,000) ; for new, equipment, furniture, and fixtures to be installed in such addition to its building ($50,000) ; and to make an anticipated refund to the U.S. Government, pursuant to the Renegotiation Act of 1951, from profits realized by the petitioner on its renegotiable sales to the Government ($30,000) ;

2. That, in addition, petitioner is entitled to retain a working capital reserve in cash, equal to 21 percent of the sum of its cost of goods sold plus its direct expenses (less the noncash expense of depreciation) for the year ended October 31, 1957, or $430,000;

3. That certain general and economic conditions (i.e., petitioner's position in a highly competitive industry; its desire to develop a greater percentage of commercial business, as distinguished from business done with the Federal Government; to develop new products and to show a more favorable balance sheet; and the general economic recession prevailing in the fall of 1957) justified petitioner's retention of its earnings and profits of the current year—although no particular amount of said earnings and profits is claimed with respect to any of these general conditions; and

4. That petitioner lacked cash with which to pay a dividend.

With regard to the first of these grounds, the evidence establishes that petitioner could reasonably anticipate, and did in fact anticipate, that it would be required to expend $70,000 in the year following October 31, 1957, for enlarging its factory building; $50,000 during said year for equipping the enlarged building with machinery and furniture and fixtures; and $30,000 during such year for making refund of excessive profits to the Government on renegotiable sales. The evidence further establishes that as of October 31, 1956, petitioner had accumulated earnings and profits from prior years of $532,663, before considering its earnings and profits of the current year (after taxes) of $261,524. Thus, petitioner had an ample "cushion" in the surplus accumulated from prior years with which to absorb the above-mentioned anticipated needs of its business which total only $150,000. It was not required therefore to accumulate further earnings and profits from the "current year" (i.e., the year ended October 31, 1957) to meet said needs. (See the above-quoted provision from Income Tax Regs., sec. 1.535–3(b)(ii).) Respondent has discharged his burden of proof with respect to this ground.

As respects the second ground above mentioned—that predicated upon retaining a cash working capital reserve—the evidence discloses that petitioner realized a substantial profit from its operations in at least every year since October 31, 1948; and that on October 31, 1957, it had unfilled orders totaling $786,000. These facts, taken in conjunction with the further facts that it had cash at October 31, 1957, of approximately $821,000, and that the average monthly cash balances

during the fiscal years 1957 and 1958 were $479,600 and $354,700, respectively, are persuasive that the reasonable needs of petitioner's business did not require it to accumulate any additional earnings and profits from its fiscal year 1957, in order to provide for anticipated working capital needs. The petitioner's position under its above-mentioned second ground ignores the favorable working capital figures of the petitioner, its very large past accumulations, and the reasonably expected profits of each of the years in question. Petitioner would have the Court look at each year isolated from past history and future expectation of profitable operations. In our judgment, based on all the evidence, petitioner's anticipated working capital requirements could be amply cared for by its accumulations from prior years plus the cash-generating transactions of its going business. The respondent has established that there was here no need to provide for future working capital needs out of fiscal 1957's earnings and profits.

As regards petitioner's third ground which concerns what we have called "general and economic conditions," the most that can be said respecting this is, that petitioner was warranted in taking a conservative approach to the matter of distributing its earnings and profits. But, with over $530,000 of earnings and profits already accumulated at the beginning of fiscal 1957, even the most conservative approach would not warrant a failure to distribute the current year's earnings and profits. The respondent has successfully borne his burden of proof as to this ground.

Finally, we come to the fourth ground, wherein petitioner claimed that it did not have sufficient cash to permit it to distribute its earnings and profits. Petitioner had, at October 31, 1957, total current assets of $1,219,292, including approximately $821,000 cash. It is true that it had against this, current liabilities of approximately $600,500; and to this must be added $150,000 for anticipated needs mentioned in our discussion of the first ground. In such situation, petitioner was not limited solely to the cash on hand at October 31, 1957, for the payment of said liabilities and anticipated needs. Unquestionably, large items of accrued liability (such as its liability for Federal income taxes and the payment into its profit-sharing plan) might have to be met from its cash on hand. But, it must be remembered too, that petitioner would continue to engage in cash-generating transactions which could reasonably be expected to, and did in fact, yield a substantial profit. And the cash thus anticipated to be generated was, in our opinion, a source of cash for the payment of many of its liabilities that existed at October 31, 1957. We note again that petitioner had over three-quarters of a million dollars of unfilled orders at October 31, 1957, thus being assured of a high volume of business in the succeeding year; and that its average monthly cash balance during the succeeding fiscal year 1958 was $354,700. We are impelled to conclude

therefore, that respondent has established that petitioner had sufficient cash to permit it to distribute to its shareholders its earnings and profits for fiscal 1957.

Petitioner's statement includes one further possible ground that deserves mention. It alleged that it had sustained a loss of $119,000 as the result of a flood in 1955; that it was still located at the same site where that flood occurred; that it carried no flood insurance; and that it was a self-insurer against loss by flood.

Income Tax Regs., sec. 1.537–1(b)(1) states in part with respect to "reasonable anticipated needs":

> In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite and feasible plans for the use of such accumulation. * * *

In the instant case, the evidence indicates that the petitioner's directors had no specific, definite, and feasible plans for providing against possible future flood losses. They took no steps in the capacity of a self-insurer to fix a probable amount of flood loss, to gage the extent of such hazard, or to establish any reserve, computed on any actuarial or other basis, to offset such a contingent casualty loss. Indeed, in the statement filed with respect to the subsequent 1958 fiscal year, no mention is made of any such contingent loss. To attempt to fix the amount of a proper reserve in such situation would be wholly speculative. We are satisfied that this ground represents a mere afterthought and is not sufficient to justify an accumulation of any specific amount. See *KOMA, Inc.* v. *Commissioner*, 189 F. 2d 390, 396, affirming a Memorandum Opinion of this Court; and *Bride* v. *Commissioner*, 224 F. 2d 39, 41–42, also affirming a Memorandum Opinion of this Court.

Re: *Petitioner's fiscal year ended October 31, 1958.*

Petitioner's grounds here are the same as those urged for 1957, except that it has added an anticipated refund ($20,000) of excessive profits to the Government on renegotiable sales of fiscal 1958; that anticipated expenditures for completing the addition to its building are down to $40,000; that anticipated expenditures for equipping the addition are $52,500; and that its claimed anticipated working capital needs are in the lesser amount of $379,000. Our Findings of Fact show that its accumulated earnings and profits at November 1, 1957, were $754,191; its total current assets at October 31, 1958, were approximately $864,000, including cash in the amount of $439,243; and its unfilled orders on the last-mentioned date totaled $738,000. Petitioner's statement, insofar as fiscal 1958 is concerned, makes no mention, as we have heretofore shown, of any anticipated flood loss.

It seems unnecessary to go over each of these grounds again. Suffice it to say that, in our opinion, petitioner's accumulated earnings

and profits of nearly three-quarters of a million dollars were ample not only to provide adequate working capital but also to cover its other anticipated needs. Moreover, it had ample cash (considered along with its anticipated cash-generating transactions) to enable it to distribute to its shareholders its 1958 earnings of $89,027, and also to defray its accrued liabilities at October 31, 1958, and to meet all anticipated needs.

We have hereinabove found as an ultimate fact, and we here hold, that during each of the 2 taxable years involved, petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business.

There remains the ultimate question: Whether petitioner was availed of during the taxable years for the purpose of preventing the imposition of income taxes upon its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed. As we stated in the first paragraph of this Opinion, the fact (which we have already found) that the earnings and profits were accumulated beyond the reasonable needs of the business, *is determinative* of the proscribed purpose unless the taxpayer corporation proves to the contrary by the preponderance of the evidence. Section 533 of the 1954 Code. Here, the petitioner has wholly failed to meet this burden of proof on the ultimate question. Indeed, there are at least four factors that tend to indicate that the purpose of the substantial accumulations of the years here involved was for the purpose of shielding the shareholders from taxation. At least since 1948 (which includes all years for which there is evidence of the results of its operations), petitioner had realized a substantial profit in each year. No taxable dividend was declared or paid by petitioner throughout its corporate existence covering more than 12 years. There was, as we have heretofore held, ample earned surplus and ample cash to permit the distribution of a dividend in each of the years here involved. And the two shareholders, whose capital investment did not exceed $90 each, were both fully aware that any dividends distributed to them in the taxable years would have been subject to tax at a rate of more than 50 percent. We hold, on the basis of all the evidence in accordance with our finding of ultimate fact, that petitioner was availed of for the proscribed purpose mentioned in section 532(a).

For completeness, we add that there is no merit in petitioner's contention that the respondent erred in failing to allow it an accumulated earnings credit. Petitioner was not entitled to any minimum credit under section 535(c)(2), for the reason that the amount of its accumulated earnings and profits at the beginning of each taxable year was in excess of the $60,000 mentioned in said section. Nor is petitioner entitled to the general credit provided in section

535(c)(1), for the reason that (as is shown in our discussion of the grounds in petitioner's statement, *supra*), the amount of the earnings and profits already accumulated from prior years was more than sufficient to cover petitioner's reasonably anticipated needs at the end of each of the taxable years. See Income Tax Regs., sec. 1.535–3(b)(ii), *supra*.

For all the foregoing reasons, we decide the case in favor of the respondent.

*Decision will be entered for the respondent.*